**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**BECK ENGRAVING CO., INC., Respondent.**

No. 74–2210.

United States Court of Appeals, Third Circuit.

Argued June 23, 1975.

Decided Aug. 20, 1975.

Robert A. Giannasi, David S. Fishback, N. L. R. B., Washington, D. C., for petitioner.

George A. Burnstein, Kleinbard, Bell & Brecker, Philadelphia, Pa., for respondent.

Before BIGGS, ROSENN and WEIS, Circuit Judges.

## OPINION OF THE COURT

BIGGS, Circuit Judge.

The National Labor Relations Board petitions, pursuant to 29 U.S.C. Section 160(e), for enforcement of an order of August 26, 1974. In its decision and order,[1] the Board determined that Beck Engraving Co., Inc. (respondent) violated Section 8(a)(1) and (5) of the National Labor Relations Act[2] by refusing to execute a collective bargaining agreement entered into by Philadelphia Printing Pressmen, Assistants and Offset Workers' Union No. 4 (Union) and Allied Printing Employer's Association (Association), a multi-employer bargaining unit. Respondent contends that it withdrew from the Association prior to agreement upon and execution of the collective bargaining contract. The Board found, and it argues here, that respondent's attempted withdrawal was untimely and ineffective.

The resolution of this controversy requires that we examine the nature of multi-employer bargaining units and the rules respecting withdrawals from those units. In so doing, we conclude that the Board's petition for enforcement must be denied.

### I.

Beck Engraving Co., Inc. has participated in multi-employer bargaining for more than twenty years. During this time, respondent was a member of the Association or its predecessor, Allied Printing Employers' Association. The Association has represented Beck, as well as other employers in the Philadelphia area engaged in the printing industry, in collective bargaining with the Union. In turn, the Union has been the exclusive representative of the employees of the Association's members.

As a result of negotiations, members of the Association, including Beck, executed a collective bargaining agreement with the Union which extended from May 1, 1970 through April 30, 1973. Thirteen employers were signatories to this Agreement. On January 24, 1973, the Union sent the Association a letter signifying the Union's intention to amend the terms of the agreement following its expiration on April 30, 1973. The Union and the Association, then composed of eleven member-employers, commenced negotiations on the new contract on February 28, 1973. By the time the old agreement had expired, there had been twelve meetings but no consen-

---

1. The decision and order are reported at 213 NLRB No. 13, ——. It deserves mention that the Board decided this case upon a factual stipulation, agreed to by the parties, and without a hearing before an administrative law judge. *See* 29 C.F.R. Section 102.50.

2. Section 8(a)(1) and (5) of the Act, as amended, 29 U.S.C. Section 158(a)(1) and (5) provides:

"(a) It shall be an unfair labor practice for an employer—

"(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title; . . .

"(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title."

sus on a new contract.[3] Another ten meetings were conducted in May, 1973 *after* the agreement had expired.[4] The Union took no strike action during this period.

On June 1, 1973, the Union initiated a selective strike aimed solely at respondent. Three days later, on June 4, the Union, the Association, and Mid-City Press—a member of the Association— mutually agreed that Mid-City Press would withdraw from the multi-employer bargaining unit. On June 5, 1973, the Union struck two of the remaining ten members of the Association. It struck two more employers on the following day. In short, by June 6, 1973, the Union had struck one-half of the employers composing the Association. Though negotiations resumed on June 14, and additional conferences were held on June 26 and June 27 as well as July 2 and July 3, no agreement was reached.

At this juncture, respondent's seven union employees had been on strike for over a month. On July 8, 1973, one of these employees committed suicide.[5] Five days later, five of respondent's union employees submitted their resignations from the Union. They returned to work on July 14. The last union employee of Beck resigned from the Union on the same day.[6] He returned to work on July 16.

At that time, respondent's President, George D. Beck, mailed the Union a letter stating that respondent had withdrawn from the Association. The Association sent a similar letter to the Union on July 17, explaining that it was no longer authorized to represent respon-

dent in collective bargaining with the Union. On July 18, the Association and Union agreed to terms covering the period from May 1, 1973 to April 30, 1976. The Union telegrammed Beck the next day to notify respondent that it neither consented to this withdrawal nor considered the withdrawal timely. Although the Association and Union subsequently executed the agreement, respondent has refused all entreaties to sign the contract.

II.

During initial proceedings before the Board, respondent contended that three circumstances, considered separately or integrally, justified its withdrawal from the multi-employer bargaining unit despite the fact that negotiations respecting a new contract were underway. First, Beck asserted that its withdrawal was sanctioned when all of its union employees resigned from the Union. Second, it argued that its withdrawal became permissible when Mid-City Press was allowed to withdraw from the Association. Finally, respondent contended that the Union's selective strike, targeted at only portions of the Association's membership including Beck, rather than at the entire Association, authorized Beck's withdrawal.

The Board rejected these arguments and ordered respondent, *inter alia*, to sign and implement the 1973–76 contract between the Union and Association and to pay its employees for benefits to which the agreement entitled them.[7]

Subsequently, respondent moved for reconsideration of the Board's deci-

---

**3.** The dates of these meetings were February 28; March 5, 9, 12, 19, and 26; and April 2, 12, 18, 19, 24, and 26.

**4.** These conferences were held on May 1, 7, 8, 11, 16, 19, 22, 24, 25 and 31.

**5.** The record does not establish whether the suicide was in any way related to employment difficulties, although respondent has alleged its belief that the employee was distraught because of the strike.

**6.** The Board does not contend, nor is there any evidence which demonstrates or from which

we may infer, that any of these resignations resulted from direct or indirect employer pressure.

**7.** The back-pay portion of this provision of the Board's order appears somewhat anomalous considering the fact that the parties stipulated that Beck was paying its employees wages equal to or in excess of those provided in the new agreement. The record, however, does not indicate whether other benefits have been and continue to be concomitant.

sion arguing that a bargaining impasse justified its unilateral withdrawal.[8] The Board denied the motion for reconsideration. This petition for enforcement of the Board's order followed. Beck reiterates the three arguments set out above, initially raised before the Board, and also the argument based on "impasse", and requests us to conclude that any of these points, or a combination of them, constituted an "unusual circumstance" under which unilateral withdrawal was permissible. We are constrained to reach the conclusion that the Board's order should not be enforced for the reasons set out hereinafter.

### III.

In *NLRB v. Truck Drivers Local Union No. 449 (Buffalo Linen Supply Co.)*, 353 U.S. 87, 77 S.Ct. 643, 1 L.Ed.2d 676 (1957), the Supreme Court held that the non-struck members of a multi-employer bargaining unit could, as a defense against the union's selective strike and in order to strengthen the group-orientation of the bargaining unit, utilize a lock-out until the strike was terminated. This controversy furnished the Court occasion to comment upon the development of and rationale behind multi-employer bargaining units:

> " . . . . Multi-employer bargaining long antedated the Wagner Act, both in industries like the garment industry, charactered by numerous employers of small work forces, and in industries like longshoring and building construction, where workers change employers from day to day or week to week. This basis of bargaining has had its greatest expansion since enactment of the Wagner Act because employers have sought through group bargaining to match increased union strength. Approximately four million employees are now governed by collective bargaining agreements signed by unions with thousands of employer associations. At the time of the debates on the Taft-Hartley amendments, proposals were made to limit or outlaw multi-employer bargaining. These proposals failed of enactment. They were met with a storm of protest that their adoption would tend to weaken and not strengthen the process of collective bargaining and would conflict with the national labor policy of promoting industrial peace

---

8. Petitioner urges that the impasse doctrine was not raised until respondent's motion for reconsideration. At oral argument, respondent's counsel conceded that the impasse issue was not explicitly posed prior to the motion for reconsideration but asserted that it was implicit from both the factual background of this case and the defenses constructed by respondent.

We believe that respondent's impasse argument was timely and properly raised during proceedings before the Board and that the Board had an adequate opportunity to evaluate this contention. Accordingly, it may be considered here. Additionally, we note that 29 U.S.C. Section 160(e) provides in pertinent part:

"No objection that has not been argued before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances."

Although the impasse doctrine was urged upon the Board in the motion for reconsideration, we feel that the failure to do so prior to the motion for reconsideration was excusable under the circumstances. At the time of the Board's decision in the instant case on August 26, 1974, the impasse doctrine had not advanced beyond embryonic form. Admittedly, the Eighth Circuit had discussed this point in *Fairmont Foods Co. v. NLRB*, 8 Cir., 471 F.2d 1170, 1172–1174 (1972), but the Board had denied, and has since continued to deny, that the impasse doctrine has any validity. *After* the Board's decision here, however, two other Circuit Courts provided further articulation of the impasse question, *NLRB v. Associated Shower Door Co., Inc.*, 512 F.2d 230 (9th Cir. 1975); *NLRB v. Hi-Way Billboards, Inc.*, 500 F.2d 181 (5th Cir. 1974). The *Hi-Way Billboards* decision was rendered on September 11, 1974. Based on that decision, respondent filed a motion for reconsideration on October 11, 1974, which was denied on November 7, 1974. In view of these facts, we believe it would be unfair to hold that respondent's failure to vocalize this issue *prior* to the motion for reconsideration acts as a waiver of its right to present the issue to us.

through effective collective bargaining.

"The debates over the proposals demonstrate that Congress refused to interfere with such bargaining because there was cogent evidence that in many industries the multi-employer bargaining basis was a vital factor in the effectuation of the national policy of promoting labor peace through strengthened collective bargaining.

"The inaction of Congress with respect to multi-employer bargaining cannot be said to indicate an intention to leave the resolution of this problem to future legislation. Rather, the compelling conclusion is that Congress intended 'that the Board should continue its established administrative practice of certifying multi-employer units, and intended to leave to the Board's specialized judgment the inevitable questions concerning multi-employer bargaining bound to arise in the future.'

"Although the Act protects the right of the employees to strike in support of their demands, this protection is not so absolute as to deny self-help by employers when legitimate interests of employees and employers collide. Conflict may arise, for example, between the right to strike and the interest of small employers in preserving multi-employer bargaining as a means of bargaining on an equal basis with a large union and avoiding the competitive disadvantages resulting from non-uniform contractual terms. The ultimate problem is the balancing of the conflicting legitimate interests. The function of striking that balance to effectuate national labor policy is often a difficult and delicate responsibility, which the Congress committed primarily to the National Labor Relations Board, subject to limited judicial review." (footnotes omitted). 353 U.S. at 94–96, 77 S.Ct. at 647.

■ Since the decision in *Buffalo Linen*, the federal courts have continued to recognize that multi-employer bargaining units are an important component of national labor policy. For this reason, the stability of those units is a paramount objective of the Board and an essential ingredient of its efforts to achieve peaceful labor relations. In turn, Congress recognized that the significance of these units requires that formulation of general rules governing them be entrusted to the expert judgment of the NLRB. Federal courts have acceded to that decision, and we remain aware that our scope of review is accordingly canalized and limited.[9]

The Board initiated its promulgation of regulations pertaining to either union or employer withdrawal from established multi-employer bargaining arrangements in *Retail Associates, Inc.*, 120 NLRB No. 66, pp. 388–400 (1958). In that case, the Board detailed its general principles on this point:

" . . . The right of withdrawal by either a union or employer from a multiemployer unit has never been held, for Board purposes, to be free and uninhibited, or exercisable at will or whim. For the Board to tolerate such inconstancy and uncertainty in the scope of collective bargaining units would be to neglect its function in delineating appropriate units under Section 9, and to ignore the fundamental purpose of the Act of fostering and maintaining stability in bargaining relationships. Necessarily under the Act, multiemployer bargaining units can be accorded the sanction of the Board only insofar as they rest in principle on a relatively stable foundation. While mutual consent of the union and employers involved is a basic ingredient supporting the appropriateness of a multiemployer bargaining unit, the stability requirement of the Act dictates that reasonable controls limit the parties as to the time and manner that withdrawal will be permitted from an established multiemployer bargaining

---

9. *See generally,* Annot., 12 A.L.R.3d 805; 2 CCH Labor Relations, ¶ 2610.

unit. Thus, the Board has repeatedly held over the years that the intention by a party to withdraw must be unequivocal, and exercised at an appropriate time. The decision to withdraw must contemplate a sincere abandonment, with relative permanency, of the multiemployer unit and the embracement of a different course of bargaining on an individual-employer basis. The element of good faith is a necessary requirement in any such decision to withdraw, because of the unstabilizing and disrupting effect on multiemployer collective bargaining which would result if such withdrawal were permitted to be lightly made. The attempted withdrawal cannot be accepted as unequivocal and in good faith where, as here, it is obviously employed only as a measure of momentary expedience, or strategy in bargaining, and to avoid a Board election to test the union majority. . . .

" . . . Among other things, the timing of an attempted withdrawal from a multiemployer bargaining unit, as Board cases show, is an important lever of control in the sound discretion of the Board to ensure stability of such bargaining relationships. We would accordingly refuse to permit the withdrawal of an employer or a union from a duly established multiemployer bargaining unit, except upon adequate written notice given prior to the date set by the contract for modification, or to the agreed-upon date to begin the multiemployer negotiations. Where actual bargaining negotiations based on the existing multiemployer unit have begun, we would not permit, except on mutual consent, an abandonment of the unit upon which each side has committed itself to the other, absent unusual circumstances. It is clear that under the ground rules to be promulgated, we would reach the same result as found in the present case."

(footnotes omitted). 120 NLRB 393–395.

Trimmed to its essentials, the *Retail Associates* rule may be briefly stated: prior to negotiations, either the union or an employer in a multi-employer bargaining unit may unilaterally (i. e., without the consent of the other party) withdraw if adequate written notice is given which evidences an unambiguous intent to withdraw; during negotiations, withdrawal is permissible upon mutual consent or may occur unilaterally in the event of unusual circumstances. The Courts of Appeals of several circuits have adopted and approved this formulation. See e. g., *NLRB v. Brotherhood of Teamsters, Local No. 70,* 470 F.2d 509, 510 (9th Cir. 1972), cert. denied 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 54 (1973); *NLRB v. Dover Tavern Owners Association,* 412 F.2d 725, 728 (3d Cir. 1969); *NLRB v. Paskesz,* 405 F.2d 1201, 1202 (2d Cir. 1969); *NLRB v. Tulsa Sheet Metal Works, Inc.,* 367 F.2d 55, 57 (10th Cir. 1966); *NLRB v. Sklar,* 316 F.2d 145, 150 (6th Cir. 1963). In the *Retail Associates* case and, later, in *The Evening News Association,* 154 NLRB No. 121, pp. 1494–1516 at 1501 (1965), enforced *sub nom. Detroit Newspaper Publishers Association v. NLRB,* 372 F.2d 569, 572 (6th Cir. 1967), the Board espoused the tenet that identical principles regarding multi-employer bargaining and withdrawals will be applied equally to the union and the individual employers. Since Beck withdrew unilaterally during contract negotiations, the issue presented us is whether "unusual circumstances" justified respondent's action.

## IV.

The Board urges that the "unusual circumstances" exception be limited to two situations: (1) extreme financial hardship threatening the existence of the employer as a viable business entity;[10] and (2) fragmentation or dissipation of the

---

10. *See e. g., NLRB v. Spun-Jee Corp.,* 385 F.2d 379, 382 (2d Cir. 1967) (remand for Board to consider this question); *Spun-Jee Corp.* and the *James Textile Corp.,* 171 NLRB No. 64, pp. 557, 558 (1968) (adoption of financial hardship exception on remand).

multi-employer bargaining unit.[11] Neither situation, it contends, existed in this case. We do not agree that the "unusual circumstances" exception can be so narrowly circumscribed.

■ We recognize that neither the permitted withdrawal of Mid-City Press from the Association nor the Union's selective strike amounted to sufficient grounds for Beck's unilateral withdrawal. The withdrawal by Mid-City Press was effective, despite its occurrence during negotiations on a new contract, because the Union consented to the action. Obviously, the fact that the Union consents to the withdrawal of one employer does not amount to tacit consent to other withdrawals. Were the rule otherwise, the bargaining unit would be so inflexibly structured that it would collapse whenever the union permits any withdrawal. Moreover, there is not the slightest evidence from which we can conclude, as respondent argues, that the departure of Mid-City Press fragmentized the Association. The withdrawal of one employer, having only two Union employees,[12] from an eleven member Association does not terminate the Association's viability.

■ In *Buffalo Linen, supra,* 353 U.S. at 93–97, 77 S.Ct. at 643, the Supreme Court indicated that the appropriate response to the selective strike, and the one which best preserves the stability and integrity of the multi-employer bargaining unit, is the lockout. A selective strike does not *per se* create an "unusual circumstance" permitting the withdrawal of an affected employer from the multi-employer bargaining unit. Cf. *State Electric Service, Inc.,* 198 NLRB No. 77 (1972), enf'd. 477 F.2d 749 (5th Cir.) cert. denied, 414 U.S. 911, 94 S.Ct. 234, 38 L.Ed.2d 149 (1973).

As we have noted, the Board has enunciated the even-handed principle that its regulations for withdrawal from multi-employer bargaining units are the same for unions and employers. *The Evening News Association, supra,* 154 N.L.R.B. at 1501 (1965). Its subsequent decisions have reflected an effort to effectuate this policy. For example, the Board has held in a series of opinions that a union may withdraw from a multi-employer bargaining unit with respect to one or more, but not all, employers *if* the withdrawal is timely and unequivocal. *Pacific Coast Association,* 163 N.L.R.B. No. 129, pp. 892–899 at 896 (1967); *Hearst Consolidated Publications, Inc.,* 156 N.L.R.B., No. 16, 210, 212 (1965) enforced *sub nom., Publishers' Association of New York City v. NLRB,* 364 F.2d 293 (2d Cir.), cert. denied 385 U.S. 971, 87 S.Ct. 509, 17 L.Ed.2d 435 (1966); *The Evening News Association,* 154 NLRB No. 121, 1494, 1501 (1965), enforced *sub nom., Detroit Newspaper Publishers Association v. NLRB,* 372 F.2d 569, 572 (6th Cir. 1967). In substance, these cases merely apply the *Retail Associates* rule, *supra,* 120 NLRB 393–395, to the union as well as the employer.

But the Board has not contented itself with this approach. Instead, it has given its imprimatur to the union's negotiation of interim, separate agreements with individual members of the multi-employer bargaining unit. *P.H.C. Mechanical Contractors,* 191 NLRB No. 121, pp. 592–596 (1971); *Sangamo Construction Company,* 188 NLRB No. 26, 159–163 (1971). The undeniable import of this policy is that the union may reach agreements with one or more employers of the bargaining unit and then whipsaw the remaining employers of the bargaining unit.

■ It is not sufficient to say, as the Board does, that such an arrange-

11. *See e. g., NLRB v. Southwestern Colorado Contractors Association,* 447 F.2d 968, 969 (10th Cir. 1971); *Connell Typesetting Co.,* 212 N.L.R.B. No. 140 (1974).

12. *See* Exhibit III(b), Appendix, p. 22. Unfortunately, the record does not specify the num- ber of Union workers employed by the Association's members. In this case, however, we have no hesitancy in determining that Mid-City Press' withdrawal did not fragment the Association.

ment does not preclude an individual employer from reaching an individual and interim accord with the union. Rather, the point is that each individual agreement strengthens the union's hand vis-à-vis those employers who continue to bargain within the unit. Moreover, allowing individual negotiations even on an interim basis is tantamount to a rejection of the existence of the multi-employer bargaining unit. We believe it inconsistent to say that the union and some employers may act on an individual basis while other employers within the same unit, relegated to this posture by the union's refusal to negotiate with them on an individual basis, must adhere to group bargaining. The union, under the Board's own policy, should not have been given two weapons for its economic arsenal (i. e., the selective strike and individual negotiations) while the employers are given only one (viz., the lockout). We believe that the Board's approval of individual, interim agreements during multi-employer bargaining and *without* requiring withdrawal from the multi-employer bargaining unit is sufficient cause for according the employer an equivalent right. See *Fairmont Foods Co. v. NLRB,* 471 F.2d 1170 at 1174, n.1 (8th Cir. 1972). Moreover, the Board's decisions and its stated policy of applying its rules equally to both Union and employer require us also to conclude that a negotiating impasse justifies an employer's unilateral withdrawal from the multi-employer bargaining unit.

We, therefore, join the Ninth, Fifth, and Eighth Circuits and hold that a ne-gotiating impasse justifies unilateral withdrawal from a multi-employer bargaining unit, *NLRB v. Associated Shower Door Co., Inc.,* 512 F.2d 230 at 232 (9th Cir. 1975), petition for cert. filed, 44 U.S.L.W. 3062 (U.S. July 23, 1975) (No. 75–127); *NLRB v. Hi-Way Billboards, Inc.,* 500 F.2d 181 at 183–184 (5th Cir. 1974);[13] *Fairmont Foods Co. v. NLRB, supra* at 1172–1173 and 1174, n.1.[14]

The Board would have us conclude nevertheless that the impasse doctrine does not apply to this case. It argues (1) that the Union in this case did not attempt to negotiate individual interim agreements during the bargaining and (2) that a negotiating impasse did not exist at the time Beck withdrew. We cannot agree that either proposition requires enforcement of the Board's order in this case.

■ The employer's right to withdraw during a bargaining impasse cannot be made contingent upon the union's prior exercise of its right to negotiate individual interim agreements. The rights of the parties should accrue simultaneously based upon the occurrence of an event which neither can manipulate (e. g., impasse). Were the rule otherwise, the party whose right accrues first would be given a tremendous bargaining advantage and leverage. We recognize that, to some extent, basing the right of withdrawal upon the existence of an impasse rather than of individual negotiations contributes to instability within the context of multi-employer bargaining. Cer-

---

13. The *Associated Shower Door* and *Hi-Way Billboards* decisions rely heavily upon the Board's decision in *Pacific Coast Association, supra,* as grounds for the enunciation of the impasse doctrine. In our view, the impasse doctrine is not justified solely by Pacific Coast Association which merely gives a union the right to withdraw from multi-employer bargaining if, *prior to negotiations,* the union gives timely notice.

14. To some extent, the Eighth Circuit's articulation of the impasse doctrine in *Fairmont Foods, supra,* was based on the Board's decision in *Morand Bros. Beverage,* 91 NLRB No. 58, pp. 409–442 at 417–418 (1950), enforced in part and remanded in part, 190 F.2d 576 (7th Cir. 1951), which held that impasse could excuse a withdrawal. The Board argues that *Morand Bros.* antedated the rule permitting employers to use retaliatory lockouts and that it became moribund when the Board later announced its rules on withdrawals in *Retail Associates, supra,* following *Buffalo Linen, supra.* We feel that the resuscitation of *Morand Bros.* is attributable to the Board's own policy of permitting union negotiation of interim, individual agreements. *See also Hi-Way Billboards, supra,* 500 F.2d at 184, discussing the viability of *Morand Bros.*

tainly, that is the result in this case. But we cannot avoid the conclusion that this additional incremental instability, however unfavorable to the policy aimed at stabilization of these units, is a necessary concomitant of ensuring that the parties have equal rights and that the existence and implementation of such rights do not grant unfair advantage to either party.[15]

There remains the issue of whether, in fact, a negotiating impasse existed between the Union and the Association when Beck withdrew. As we have explained, the Board decided this case on the basis of a stipulated factual record. In addition, Beck did not explicitly raise the impasse issue until it moved for reconsideration of the Board's decision. See note 8, *supra*. Nonetheless, neither party requests a remand for further factual development on this issue. Both urge that there is sufficient factual basis for us to decide the question of whether an impasse existed. We agree and believe that the record amply supports the conclusion that the parties were at loggerheads when Beck withdrew on July 16, 1973.[16]

◾ Negotiations on a new contract began two months before the expiration of the old agreement. In the ensuing three months, twenty-two meetings be-

tween the parties proved unproductive. The Union then commenced a series of selective strikes in June, 1973 aimed at breaking the deadlock. During that month, the parties met only three times, and the strikes persisted into July. On July 2 and 3, the Union and Association met again. No agreement was forthcoming. Over the following two weeks, Beck's union employees—frustrated by the length of the strike—returned to work. When Beck withdrew on July 16, the parties had not convened a meeting for almost two weeks. Two days after the withdrawal, an agreement was reached. In sum, the record depicts lengthy and frequent negotiations, extending through twenty-seven meetings over the course of four months, in which the parties appear to have bargained in good faith. At the time of the withdrawal, however, the parties had not met for almost two weeks and the selective strikes had endured for a month and a half. Exhibit IV of the record, a letter from Beck to one of its employees dated June 1, 1973, reflects the fact that the parties' disagreement related to the fundamental question of the *economic* aspects of the collective bargaining agreement. We view this as a portrait of impasse.

The Board suggests that, because the new contract was negotiated only two

---

**15.** We reiterate that many of the ultimate policy judgments in this area should be made by the Board because of its expertise. We merely seek to redress an imbalance created by the Board's decisions and recognize that we cannot and should not dictate to the Board the manner in which the balance should be achieved. In this regard, the Board may well decide that the impasse doctrine and the right of the union to negotiate individual, interim agreements form part of a less desirable equilibrium than a return to the *Retail Associates* rule.

**16.** The term "impasse" has been variously defined. The Board explained the pertinent considerations in *Taft Broadcasting Co.*, 163 NLRB No. 55, 475, 478 (1967):

"Whether a bargaining impasse exists is a matter of judgment. The bargaining history, the good faith of the parties in negotiations, the length of the negotiations, the importance of the issue or issues as to which there

is disagreement, the contemporaneous understanding of the parties as to the state of negotiations are all relevant factors to be considered in deciding whether an impasse in bargaining existed."

This decision was enforced in *American Fed. of Television & Radio Artists v. NLRB*, 129 U.S.App.D.C. 399, 395 F.2d 622 (1968) where the Court noted that the Board's finding "that there was no realistic possibility that continuation of discussion at that time would have been fruitful" was a "sound standard of deadlock". 395 F.2d at 628, n.17.

In the instant case, the Board made no explicit factual determination as to impasse but has emphasized its position that impasse does not justify unilateral withdrawal. Even assuming that the Board's decision and its denial of the motion for reconsideration constituted a factual finding that there was no impasse, such a determination is *not* supported by substantial evidence.

days after Beck's withdrawal, any impasse which might have existed previously necessarily evaporated by the time Beck withdrew. The parties, it argues, must have been near agreement on that date. The record is devoid of any evidence to support this contention. There is no factual basis from which to conclude that an impasse did not exist on July 16 [17] or that Beck was aware of a pending agreement and withdrew in order to avoid it. Indeed, the record indicates the likelihood that the withdrawal of Beck, the first employer to be struck by the Union, hastened the end of impasse and thereby helped precipitate the agreement of July 18, 1973. In any event, the negotiating impasse continued through July 16 and justified Beck's unilateral withdrawal.

## V.

Due to our disposition of this case, it is unnecessary to reach the question of whether Beck's withdrawal was sanc-

tioned by the fact that all of its employees had resigned their union memberships.[18] This circumstance, however, is not without impact upon this case.

■ Where a union gives timely notice of its intent to withdraw, the refusal of the employers to bargain on an individual basis is an unfair labor practice. *Detroit Newspaper Publishers Association v. NLRB*, 372 F.2d 569, 571 (6th Cir. 1967); *Publishers Association of New York City v. NLRB*, 364 F.2d 293 at 296 (2d Cir.), cert. denied 385 U.S. 971, 87 S.Ct. 509, 17 L.Ed.2d 435 (1966). It may well be that this rule should be extended to individual employers who withdraw solely because of a negotiating impasse. We need not resolve that issue in this case. Any duty which Beck may have had to negotiate individually with the Union following Beck's withdrawal was obviated because, at that time, Beck had a good faith doubt as to the majority status of the union among its employees.

**17.** Again, it should be emphasized that the parties did not even meet between July 3 and July 18. Thus, negotiations were not continuing at the time of the withdrawal.

**18.** In *NLRB v. Sheridan Creations, Inc.*, 357 F.2d 245 (2d Cir. 1966), cert. denied 385 U.S. 1005, 87 S.Ct. 711, 17 L.Ed.2d 544 (1967), the employer contended that its attempted withdrawal from the multi-employer bargaining unit was authorized because three of its four employees desired not to be represented by the union. The Court rejected this claim:

"Respondent argues that it would be illegal for it to bargain after it knew that a majority of its employees had withdrawn. 'Its,' however, refers to the bargaining unit, once one has been established, rather than one employer of a multi-employer unit." 357 F.2d at 248.

Chief Judge Lumbard dissented, reasoning that the consensual nature of the multi-employer bargaining arrangement and the policy of prohibiting an employer from bargaining with a non-representative union required that the withdrawal be permitted. 357 F.2d at 248–249.

In substance, the Second Circuit reaffirmed *Sheridan Creations* in *NLRB v. John J. Corbett Press, Inc.*, 1 Cir., 401 F.2d 673 (1968). There, the employer had discharged its union employ-

ees during contract negotiations. Although the discharges were not unfair labor practices, the Court explained that "the presence or absence of employees who belonged to the union is irrelevant to respondent's duty to bargain and to execute the completed agreement." 401 F.2d at 675. We have some doubt that this is a correct statement of the law in the context of the case *sub judice*. Here it would deny employees the right to resign voluntarily from the Union in order to be represented by an organization of their choice or not to be represented at all. Moreover, the cited cases did not consider whether resignation of all the employees is an "unusual circumstance" justifying withdrawal from the bargaining unit by the employer. *See also Service Roofing Co.*, 173 NLRB No. 44, 321–324 (1968) (employer's attempt to become a non-union shop), aff'd. by summary decree 62 L.C. ¶ 10,842 (9th Cir. 1970).

Under the circumstances of this case, we refrain from determining whether these cited cases are factually distinguishable from the instant case or from deciding whether, once the bargaining unit is established, the problem of employee disaffection with or defection from the union must be viewed in terms of individual employer units or the multi-employer bargaining unit.

Nor is there any evidence which suggests that Beck's continuing denial of the union's majority status is not in good faith. See e. g., *Local 148–162 ILGWU v. NLRB*, 450 F.2d 462, 463 (3rd Cir. 1971); *NLRB v. Quality Markets, Inc.*, 387 F.2d 20, 23–24 (3d Cir. 1967).

The Board's petition for enforcement of its order will be denied.