PETER J SAKER, INC., A CORPORATION, PLAINTIFF-RE-
SPONDENT, v. CARPENTERS DISTRICT COUNCIL OF
SOUTH JERSEY, LOCAL NO. 121; MONMOUTH COUNTY
CARPENTERS LOCAL UNION NO. 2250 OF RED BANK,
DEFENDANTS-APPELLANTS, AND THE AMERICAN AR-
BITRATION ASSOCIATION, DEFENDANT.

Superior Court of New Jersey
Appellate Division

Argued October 3, 1977—Decided November 2, 1977.

420

Before Judges ALLCORN, MORGAN and HORN.

Mr. *Theodore Sager Meth* argued the cause for appellants (Messrs. *Meth, Wood & Broege,* attorneys; Ms. *Ellen H. Thelin,* on the brief).

Mr. *Richard M. Salsburg* argued the cause for respondent (Messrs. *Salsburg* and *Kraemer,* attorneys).

The opinion of the court was delivered by

HORN, J. A. D. Defendants Carpenters' District Council of South Jersey, Local Union No. 121 and Monmouth County Carpenters' Local Union No. 2250 of Red Bank appeal from a judgment entered in the Superior Court, Chancery Division, in favor of Peter J. Saker, Inc. (Saker) on September 16, 1976, permanently enjoining said defendants from proceeding to arbitration as to claimed grievances under the terms of a collective bargaining agreement executed June 5, 1975 and dated as of May 1, 1975, between defendants and Building Contractors' Association of New Jersey (BCA) and Associated Contractors of Monmouth and Ocean Counties, and

dismissing defendants' counterclaim for a judicial declaration that plaintiff was bound by the terms of the aforementioned agreement.

Defendants are subordinate bodies of the United Brotherhood of Carpenters and Joiners of America, AFL-CIO, representing carpenters within their trade and territorial jurisdiction in their respective areas in the State of New Jersey. Following a bench trial covering five days during June and July 1976, the judge entered the foregoing judgment on findings of fact and conclusions of law.

For many years prior to April 30, 1975 Saker was a member of two multi-employer bargaining associations: BCA, a statewide employer association, and Associated Contractors of Monmouth and Ocean Counties, a local employer association. As a member of BCA Saker was bound to the collective agreements negotiated between BCA and defendants. Its individual bargaining rights were subordinated to the local and state associations pursuant to the constitution and by-laws of each association. A two-year collective bargaining agreement between the BCA and the two defendant locals terminated on April 30, 1975.

Prior to said expiration of the contract defendants gave timely notice pursuant to the termination article in each agreement of desires to bargain about changes in wages, hours and other terms and conditions of employment rather than automatically extending the terms and conditions of the 1973 contract. BCA, on Saker's behalf, participated in the negotiating sessions with defendants. BCA and defendants finally negotiated a new collective bargaining agreement on June 5, 1975, which was by its terms made effective as of May 1, 1975.

The controversy between the parties to this litigation arose by reason of plaintiff's contention that it had made a timely and legal withdrawal from BCA prior to the execution of the agreement, so that the negotiated contract was not binding upon it. Defendants denied that plaintiff was legally able, under the circumstances, to make a valid withdrawal

and, in addition, contended that if it did have the right to do so, it failed to properly do so. When defendants asserted that they desired to arbitrate alleged grievances under the newly negotiated contract on the thesis that plaintiff was bound to observe those terms as a member of BCA, plaintiff commenced the instant declaratory judgment action, which resulted in a favorable decision at the hands of the trial judge. Thus the primary issue before us is whether the collective bargaining agreement negotiated to commence as of May 1, 1975 was binding upon plaintiff.

Multi-employer bargaining was declared to be a vital factor in the effectuations of the national policy of promoting labor peace through strengthened collective bargaining. *National Labor Rel. Bd. v. Truck Drivers Local U.*, 353 U. S. 87, 77 *S. Ct.* 643, 1 *L. Ed.* 2d 676 (1957); *N. L. R. B. v. Hi-Way Billboards, Inc.*, 473 F. 2d 649, 652 (5 Cir. 1973). However, notwithstanding this declared policy, the guidelines for the withdrawal of either individual employers or individual unions from their respective multi-bargaining units were not the subject of statutory enactment. Instead, the National Labor Relations Board promulgated regulations pertaining to such withdrawals in *Retail Associates, Inc.*, 120 *NLRB No. 66*, at 388–400 (1958). See *N. L. R. B. v. Beck Engraving Co., Inc.*, 522 F. 2d 475, 480 (3 Cir. 1975).

*Retail Associates, Inc., supra,* because of the unstabilizing and disruptive effect on multi-employer bargaining, determined that withdrawal must be accompanied by good faith and that the intention of the party to withdraw must be unequivocal and exercised at an appropriate time. Said the Board in that case:

* * * Among other things, the timing of an attempted withdrawal from a multiemployer bargaining unit, as Board cases show, is an important lever of control in the sound discretion of the Board to ensure stability of such bargaining relationships. We would accordingly refuse to permit the withdrawal of an employer or a union from a duly established multiemployer bargaining unit, except upon adequate written notice given prior to the date set by the contract for

modification, or to the agreed-upon date to begin the multiemployer negotiations. Where actual bargaining negotiations based on the existing multiemployer unit have begun, we would not permit, except on mutual consent, an abandonment of the unit upon which each side has committed itself to othe other, *absent unusual circumstances.* * * * [120 *NLRB* 393–395; footnotes omitted; emphasis supplied]

The issue before the trial judge, then, was comparatively narrow. Did plaintiff make a timely, unequivocal withdrawal in good faith when unusual circumstances prevailed? The trial judge in his construction of the applicable rules of law and his findings of fact found that plaintiff did. He found that an impasse in the negotiations was an unusual circumstance during which plaintiff could withdraw its authority to represent it from the negotiating unit. We agree. In so agreeing we find that the trial judge's findings of fact as to the issue tendered by the above question were supported by sufficient credible evidence. *Rova Farms Resort v. Investors Ins. Co.,* 65 *N. J.* 474, 484 (1974); *Close v. Kordulak Bros.,* 44 *N. J.* 589, 599 (1965); *State v. Johnson,* 42 *N. J.* 146 (1964).

The judge could find that the events leading up to plaintiff's resignation from BCA and its withdrawal of authority of that organization to represent it after May 15, 1975 actually commenced on April 29, 1975. The negotiators had met in seven formal bargaining sessions between March 24, 1975 and April 29, 1975 without any apparent progress. On April 29 the talks broke up with mutual hostility and a great deal of emotion, and without any further meeting being scheduled. Later that evening a federal mediator unsuccessfully endeavored to arrange a meeting with the negotiators for April 30. He did arrange a meeting for May 1. On that date, however, defendants and its members commenced strike action.

The meeting on May 1 and subsequent meetings on May 7 and 15 were characterized by a witness as producing neither substance nor "movement" on major issues. Even by May 20 there "was virtually no real movement toward a con-

clusion by any means. We were still facing the basic demands that were mentioned earlier." The close of a meeting held on May 22 was described as "pandemonium," a "pushing and shouting session * * * hostility * * * like we were back to starting from the beginning." It appeared that up to June 2, 1975 the parties were at "loggerheads."

Peter Saker, Sr., principal officer and stockholder of plaintiff, attended various negotiation meetings as an observer. He was present at the May 1 and May 7 meetings and observed the lack of progress as well as the rowdiness and hostility which characterized those meetings. On approximately May 12 Saker, Sr. had a somewhat unfriendly conversation with the business agent of defendant Local 2250 and told him that "I was quitting." On May 15, 1975 plaintiff sent a letter to the managing director of BCA tendering its resignation from that organization. As a matter of courtesy, Saker, Sr. at the request of the managing director attended the next meeting of BCA on May 28 and confirmed the resignation. BCA subsequently billed plaintiff for dues only up to the date of the resignation. Defendants produced testimony which controverted that of plaintiff's witnesses and argued that the trial judge should take therefrom certain inferences favorable to their position. The judge determined that an "impasse" in the negotiations had occurred at the time when plaintiff resigned from the contractors' bargaining unit and that this impasse constituted the unusual circumstances during which plaintiff could validly resign. The judge also found that the resignation "was communicated to both sides who were then negotiating the contract."

Defendants first urge that the trial court did not have jurisdiction to resolve the dispute concerning plaintiff's withdrawal. We are perplexed by defendants' specific contention, which is incorporated in the following quotation from their brief:

* * * Defendants contend that while Courts may decide the threshold question of whether a contract mandating arbitration exists, it must defer to arbitration thereafter.

We believe that it was the duty of the trial judge to determine whether the parties must arbitrate. *Moreira Constr. Co., Inc. v. Wayne Tp.,* 98 *N. J. Super.* 570, 575 (App. Div. 1968), certif. den., 51 *N. J.* 467 (1968). Accordingly we reject this contention.

Defendants next assert that, by failing to consider labor policy and by misreading previous court decisions, the trial judge erred in his conclusion that an impasse during negotiations constituted an "unusual circumstance" justifying unilateral withdrawal from negotiations by an employer.

The federal courts' definition of "unusual circumstances" differs from that of the National Labor Relations Board. Defendants' argument suggests that we should ignore the decisions of the various federal courts of appeal and apply the Board's definition.

The National Labor Relations Board's position is that the justifying "unusual cirumstances" for withdrawal by an employer are limited to "(1) extreme financial hardship threatening the existence of the employer as a viable business entity; and (2) fragmentation or dissipation of the multi-employer bargaining unit." *N. L. R. B. v. Beck Engraving Co., Inc., supra* at 481–482; *N. L. R. B. v. Hi-Way Billboards, Inc., supra.*

The courts have rejected this view and have determined that an impasse in negotiations is an "unusual circumstance" justifying withdrawal by the employer. *Beck Engraving Co., Inc., supra; N. L. R. B. v. Associated Shower Door Co., Inc.,* 512 *F.* 2d 230 (9 Cir. 1975), *cert.* den., 423 *U. S.* 893, 96 *S. Ct.* 191, 46 *L. Ed.* 2d 125 (1975); *Hi-Way Billboards, Inc., supra; Fairmont Foods Co. v. N. L. R. B.,* 471 *F.* 2d 1170 (8 Cir. 1972). *Carvel Company v. N. L. R. B.,* 560 *F.* 2d 1030 (1 Cir. 1977), referred to at oral argument, is not applicable. That case dealt only with the right of an employer to resign before negotiations commenced. It was not an "impasse" case.

■ Although defendants attempt to factually distinguish some of these cases[1] from the instant case in order to diminish or extinguish their precedential impact, we do not find from our review that the allegedly distinguishing factors were pivotal or substantial. In *Fairmont Foods Co.* and *Associated Shower Door Co., Inc.*, both *supra*, the additional circumstances were that the union negotiated separate contracts with three of the members of the multi-employer unit during the impasse. In *Hi-Way Billboards, Inc., supra,* the union and the withdrawing employer had entered into negotiations after the notice of withdrawal was given by the employer. As already stated, we do not regard these as distinguishing features. We regard them simply as attendant but not influencing circumstances.

Our view is fortified by the exposition of the law in *Beck Engraving Co., Inc., supra,* in which the court considered the holding of *Fairmont, Hi-Way Billboards, Inc.* and *Associated Shower Door Co., Inc.* In *Beck Engraving Co., Inc.* the N. L. R. B. also unsuccessfully attempted to distinguish these cases on the same grounds argued by defendants at bar. The court expressed the reasons for holding that the alleged distinguishing factors were illusory and for refusing to adopt the Board's criteria for the withdrawal by an employer. The court said:

The employer's right to withdraw during a bargaining impasse cannot be made contingent upon the union's prior exercise of its right to negotiate individual interim agreements. The rights of the parties should accrue simultaneously based upon the occurrence of an event which neither can manipulate (e. g., impasse). Were the rule otherwise, the party whose right accrues first would be given a tremendous bargaining advantage and leverage. We recognize that, to some extent, basing the right of withdrawal upon the existence of an impasse rather than of individual negotiations contributes to instability within the context of multi-employer bargaining. Certainly, that is the result in this case. But we cannot avoid the conclusion

---

[1]Defendants practically concede that *Beck Engraving Co., Inc.* is indistinguishable.

that this additional incremental instability, however unfavorable to the policy aimed at stabilization of these units, is a necessary concomitant of ensuring that the parties have equal rights and that the existence and implementation of such rights do not grant unfair advantage to either party. [*N. L. R. B. v. Beck Engraving Co., Inc.,* 522 *F.* 2d at 483-484; f.n. references omitted]

Defendants urge that the trial judge's factual finding that an impasse existed was not supported by the record. In effect, defendants ignore the stated scope of our review. As indicated in *Beck Engraving Co., Inc., supra,* the term "impasse" is not easily defined. It accepted (at 484) the N. L. R. B.'s criteria as follows:

Whether a bargaining impasse exists is a matter of judgment. The bargaining history, the good faith of the parties in negotiations, the length of the negotiations, the importance of the issue or issues as to which there is disagreement, the contemporaneous understanding of the parties as to the state of negotiations are all relevant factors to be considered in deciding whether an impasse in bargaining existed. [*Taft-Broadcasting Co.,* 163 *NLRB* No. 55, 475, 478 (1967)]

The court also noted that "the parties were at loggerheads" when the employer withdrew. The record here supports a similar characterization of the impasse when plaintiff resigned from its bargaining organization. In addition, we are of the view that the reasoning of *Beck Engraving Co., Inc.* is sound and should be followed by us.

The judge found as an additional or alternative reason for defendants' being bound by plaintiff's resignation that defendants acquiesced in the withdrawal. Since we believe that defendants had a timely notice of the resignation and that the resignation was submitted bona fidely and under unusual circumstances, *i. e.,* a bargaining impasse, this point is not material to our determination.

Finally, defendants submit that plaintiff was guilty of laches, since it was aware of defendants' efforts and desires to go to arbitration well before plaintiff brought suit to enjoin arbitration. It is generally held that "laches consists of an unexplained and inexcusable delay in enforcing a

known right whereby prejudice has resulted to the other party because of such delay." *Clark v. Judge,* 84 *N. J. Super.* 35, 53 (Ch. Div. 1964), aff'd 44 *N. J.* 550 (1965). The delay was not unexplainable or inexcusable. Plaintiff was first confronted with defendants' desire to arbitrate in December 1975 and at all times contended that it was not contractually bound to arbitrate with defendants. Plaintiff and defendants were in communication over this matter between December and the initiation of this suit. Presumably plaintiff was hoping that defendants' demand for arbitration would be withdrawn without resort to a court action, hence the five-month delay in bringing the action. Defendants assert they were prejudiced by delay, since they expended counsel fees in connection with preparations for arbitration and gave up the right to strike, *etc.,* pending the arbitration. This argument is without substance. Plaintiff made defendants aware of its position — that plaintiff would not proceed to arbitration. Therefore defendants prepared for arbitration and did not strike or take other action, with knowledge that plaintiff would not participate in the arbitration. In short, defendants made a voluntary choice, being aware of the circumstances. The detriment defendants allegedly suffered was a result of their own voluntary and knowing actions. Hence this point likewise lacks merit.

Concluding that the trial court did not err as contended by defendants, the judgment is affirmed.