622 F.2d 381
 104 L.R.R.M. (BNA) 2530, 89 Lab.Cas. P 12,094
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
and
Carpenters' District Council of Greater St. Louis, AFL-CIO, Intervenor,
v.
CUSTOM WOOD SPECIALTIES, INC., Respondent,
and
Employees Group, Party in Interest.
 No. 79-1936.
 United States Court of Appeals,
Eighth Circuit.
 Submitted April 15, 1980.
Decided May 30, 1980.
 
 Andrew F. Tranovich, Atty., N.L.R.B., Washington, D.C., argued; William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel and Elliott Moore, Deputy Associate Gen. Counsel, Washington D.C., on brief, for petitioner.
 Edwin P. Harrison, Clayton, Mo., for respondent.
 
 
 1
 Before HEANEY and ARNOLD, Circuit Judges, and SACHS, District Judge.*
 
 
 2
 SACHS, District Judge.
 
 
 3
 The National Labor Relations Board petitions this Court pursuant to section 10(e) of the National Labor Relations Act as amended, 29 U.S.C. § 160(e), for the enforcement of an order of the Board against respondent Custom Wood Specialties, Inc. The proceedings in this case began when the Board, upon the filing of a charge and an amended charge by the Carpenters' District Council of St. Louis, AFL-CIO (hereinafter the Union), issued a complaint against the Company. The complaint alleged that the Company had engaged in various unfair labor practices within the meaning of section 8(a)(1), (2), and (5), all stemming from the Company's purported withdrawal from its multi-employer bargaining unit, the Associated Cabinet Shops and Laminating Industry of St. Louis (hereinafter the Association). The Administrative Law Judge found the Company in violation of the Act, issued a remedial order, and the Board affirmed that decision and adopted the proposed order. We agree with the Board and grant the Board's application for enforcement.
 
 
 4
 During the time that the Company had been a member of the Association, beginning in 1963, the Association and the Union had negotiated and entered into a series of five collective bargaining agreements, the last of which expired April 30, 1978. Negotiations were begun on a sixth contract in January, 1978. There is no doubt that the Company was a member of the Association at that time. Its president and chief executive officer served on the Association's negotiating committee and as recording secretary of the committee. Several negotiating sessions were conducted prior to expiration of the contract, with the Company's participation, but when no agreement had been reached prior to expiration, the Union struck several employers in the Association, including the Company, on May 1, 1978. No allegations of an impasse in bargaining at that point or any other time have been made, however. The Company participated in at least one negotiating session between the Association and the Union after May 1, 1978.
 
 
 5
 On May 22, 1978, an individual employee of the Company filed a petition with the Board seeking decertification of the Union as bargaining agent, and indicating that at least 30% of the Company's 15 employees supported it. By letter dated May 23, 1978, the Association informed the Company that it had learned of the filing of the decertification petition and that "(u)nder these circumstances we must ask for your immediate resignation" from the Association and the negotiating committee. The Company replied on May 24, 1978, that it had received the letter "in reference to our employees starting proceedings for a decertification" and that it agreed "with the contents of your letter that I would be unable, in good faith, to continue to be a member . . .".
 
 
 6
 After that date, the Company took no part in the negotiations which led to a contract between the Union and the Association on August 8, 1978, effective May 1. The Company has refused to abide by that contract or to furnish the Union with information necessary to administer the provisions of that contract. Instead, it negotiated and entered into a separate agreement with its own employees, after telling a spokesman for the employees that it would not sign the new contract between the Union and the Association. The Union protested the Company's attempted withdrawal on May 25, 1978, and has continued to protest it and to insist that the Company has remained part of the Association and is bound by the contract.
 
 
 7
 It is well settled that, once negotiations have begun on a contract, an employer may not withdraw from a multi-employer bargaining unit absent consent of the union or "unusual circumstances." See generally, N.L.R.B. v. Acme Wire Works, Inc., 582 F.2d 153 (2d Cir. 1978); N.L.R.B. v. Beck Engraving Co., Inc., 522 F.2d 475 (3d Cir. 1975); N.L.R.B. v. Siebler Heating & Air Conditioning, 563 F.2d 366 (8th Cir. 1977). "(M)ulti-employer bargaining is a vital factor in effectuating a national policy of promoting labor peace through strengthened labor bargaining." Id. at 371.
 
 
 8
 The Company now contends that two circumstances justify its withdrawal from the unit: first, the filing of the decertification petition and the resulting request for resignation from the Association; and, second, certain interim agreements which were entered into between the Union and some members of the Association, which allowed employees to continue working at those shops while other shops were on strike beginning May 1. We find substantial evidence supporting the Board's holding that the actual reason for withdrawal was the filing of the petition, which was untimely and does not constitute an "unusual circumstance." We need not reach the question of whether, in this instance, withdrawal could have been justified by the interim agreements.[1]
 
 
 9
 The letter from the Association to the Company, and the reply of the Company, refer only to the filing of the decertification petition as a reason for withdrawal. The Company never communicated to the Union or the Association any objections to the interim agreements or any argument that withdrawal was on this basis. The interim agreements were signed before the strike on May 1, and no move to withdraw was made until after the filing of the petition on May 22. The interim agreements issue was not raised by the Company until Board proceedings began, many months later, and may be considered to be an afterthought. After hearing evidence, the Administrative Law Judge so characterized the issue. It cannot reasonably be considered the reason for the withdrawal. N.L.R.B. v. Central Plumbing Co., 492 F.2d 1252, 1254 n. 3 (6th Cir. 1974); N.L.R.B. v. Tulsa Sheet Metal Works, Inc., 367 F.2d 55 (10th Cir. 1966).
 
 
 10
 Respondent argues that the withdrawal should be approved even though its reason was unsound, if its later argument pertaining to interim agreements should be accepted. The only case cited for this proposition, however, simply allows use of a theory which was implicit in the withdrawal contentions from the beginning, and was justifiably delayed in its articulation. Beck Engraving, supra, 522 F.2d at 479, n. 8.
 
 
 11
 Based on the cited authorities from other Circuits, we conclude that the soundness of a withdrawal from a multi-employer unit is to be tested by considering the actual motivation of the employer seeking to withdraw from the unit. The record in this case lacks any showing that respondent's departure from the bargaining unit was motivated by anything other than its having been "kicked out of the Association," because of the decertification petition.
 
 
 12
 The Regional Director subsequently dismissed the employee decertification petition filed on May 22 which triggered the withdrawal. After affirmance of this action by the Board, he dismissed a later petition filed by a group of the Company's employees July 31, 1978. The units set forth in the petitions were inappropriate units for bargaining. The appropriate unit was that made up of all employees of the multi-employer Association. See N.L.R.B. v. Tahoe Nugget, Inc., 584 F.2d 293, 303-04 (9th Cir. 1978).[2]
 
 
 13
 The respondent Company has referred to no authority which would support a contention that the filing of a decertification petition alone, in either an appropriate unit or an inappropriate one, justifies withdrawal from the multi-employer bargaining unit, and we can conceive of no rationale which would lead to this conclusion. Respondent might suggest, however, that the Board and the Court could find "unusual circumstances" in the fact that its bargaining agent relied on the decertification petition in requesting its departure.
 
 
 14
 It would seem clear, however, that a mutual mistake of law by an employer and its bargaining agent, not shared by the Union and promptly protested by Union counsel, does not justify an untimely withdrawal of bargaining authority. The stability of the bargaining relationship between a union and an employer representative cannot be destroyed during bargaining by agreement between the employer and its own agent. The necessary acquiescence must generally come from the other side of the table.
 
 
 15
 This case is unlike the Siebler case, heretofore cited, where this Court held that an employer was free to revoke the authority of a bargaining agent whose conduct was disloyal to vital interests of the employer. No disloyalty or comparable misconduct by the multi-employer group is evidenced by this record or is claimed by respondent. There is no unfairness, therefore, in holding respondent to the contract entered into by the group in August, 1978.
 
 
 16
 If the Siebler ruling were to be extended to any situation where there is an actual but unauthorized severance of the agency relationship during bargaining the stability of collective bargaining would be unsoundly weakened. Neither employees nor employers should be permitted to retract a bargaining agent's authority in a manner inconsistent with reasonable Board policies designed to produce stable and effective collective bargaining procedures.
 
 
 17
 We agree with the Board in holding respondent to the contract entered into on behalf of the multi-employer group, and to which respondent would have been a consenting party except for a mistake of law not shared by the Union.
 
 
 18
 Enforcement granted.
 
 
 
 *
 The Honorable Howard F. Sachs, United States District Judge for the Western District of Missouri, sitting by designation
 
 
 [1]
 While the Third Circuit in Beck Engraving, supra, reasoned that an impasse in bargaining excused withdrawal due in large part to the possibility that interim agreements entered into upon impasse could be used to "whipsaw" the remaining employers into agreement, it cannot be said on the record in the instant case that the Company was seeking to avoid any "whipsaw" effects of the agreements. Impasse has never been alleged and there is no evidence in the record to support a finding of impasse. So far as this record shows, although economic pressures were being exerted, there was no break in bargaining and the bargaining unit was intact until respondent's purported withdrawal. The interim agreements were not inconsistent with this conclusion, being so-called "me too" agreements, expressly designed to be completely superseded, by their own terms, by the contract later negotiated
 This Court has previously treated a union's "willingness to bargain with other individual employers during (an) impasse (as) evidence of acquiescence" in the dismantling of a multi-employer bargaining group. Fairmont Foods Company v. N.L.R.B., 471 F.2d 1170, 1174 (8th Cir. 1973). The Court specifically relied, however, on lack of proof that the agreements so made were bona fide interim agreements, designed to terminate when a multi-employer contract had been negotiated. Id. n. 1. We recognize that opinions in at least four other Circuits have seriously questioned the fairness of the Board's policies favoring retention of multi-employer bargaining units despite the existence of interim agreements between a union and some of the employer members of the group. N.L.R.B. v. Independent Ass'n of Steel Fabricators, 582 F.2d 135, 147 (2d Cir. 1978). Whether interim agreements executed in the absence of an impasse in negotiations give cause for fragmentation is by no means settled, however, and we are reluctant to take on that issue unnecessarily in this case, since it involves second-guessing the Board on economic analysis and labor policy entrusted primarily to that administrative agency.
 
 
 [2]
 Even if the Company's employees had comprised an appropriate bargaining unit, the filing of a decertification petition alone is not sufficient to support a good faith doubt of the union's majority status. Allied Industrial Workers Local No. 289 v. N.L.R.B., 476 F.2d 868, 881 (D.C. Cir. 1973)