**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**HI–WAY BILLBOARDS, INC.,
Respondent.**

No. 71–3415.

United States Court of Appeals,
Fifth Circuit.

Feb. 8, 1973.

Marcel Mallet-Prevost, Asst. Gen. Counsel, N.L.R.B., Washington, D. \C., Clifford Potter, Director, Region 23, N. L.R.B., Charles P. Donnelly, Atty., N.L. R.B., Houston, Tex., for petitioner.

Thomas R. Beech, Houston, Tex., for respondent.

Before JOHN R. BROWN, Chief Judge, and GODBOLD and SIMPSON, Circuit Judges.

SIMPSON, Circuit Judge:

The National Labor Relations Board (NLRB) seeks enforcement of its order against respondent Company, upon the Board's findings of violations of certain sections of the National Labor Relations Act as amended, Title 29 U.S.C. Sec. 151 et seq. On the basis of the singular evidence presented, we decline to order enforcement, but instead, remand for further proceedings before the Board.

The background for this dispute may be stated briefly. For approximately seventeen years the Sign and Pictorial Painters Local Union No. 550 (Union) has had a history of collective bargaining with the Houston, Texas, Sign Manufacturers Association (Association), an association with a history of bargaining in prior years for most but not all of its member-employers during that time.[1] Membership in the Association did not necessarily import an authorization by a particular member to be bound by the Association's negotiations; on the other hand, non-members of the Association have at times themselves adopted the agreement negotiated between the Union and the Association. In July 1967, the Association and the Union executed such

---

1. Prior to May 1970, the employers' association was known as the Houston Sign Contractors Association.

a collective bargaining agreement which was to be effective until July 20, 1970.

The respondent, Hi-Way. Billboards, Inc. (Company) is a Texas corporation engaged in the manufacture, sale and erection of billboards, signs and other advertising displays. Although a member of the Association, the Company did not authorize the Association to be its bargaining agent for the 1967 negotiations, but instead became a party thereto by subsequent ratification. It seems that, similarly, in 1963 and 1965 the Company advised the Union that it intended to negotiate separately from the Association and did so.

We come now to the circumstances of the present difficulty. The Union's business representative and financial secretary, Joe Fatta, notified the Association by letter of May 8,.1970, of the Union's desire to negotiate changes in the existing agreement. The chairman of the Association's bargaining committee replied on May 18 indicating the Association's desire to negotiate a new agreement on behalf of its members. Thereafter some sixteen bargaining sessions were held between May 25 and August 24, the date of the newly negotiated agreement (effective as of July 20). Participants were the Union, the Association and eleven employers not including the respondent Company. It is the failure of the Company to accept and be bound by the August 24 agreement that petitioner NLRB alleges was an unlawful refusal to ratify a collective bargaining agreement between the Union and the multi-employer Association authorized to bargain for it which thus violated Section 8(a)(5) and (1) of the Act, Title 29 U.S.C. Sec. 151 et seq.

The trial examiner found that, unlike in prior negotiating years, the Company gave no notice to the Association at the inception of the 1970 negotiations that it intended to negotiate separately from the Association and, for this reason, concluded the Union was justified in understanding that the Association bargaining in 1970 was designed to embrace the Company. Indeed, as amply supported by the record, for thirteen bargaining sessions, May 25 until July 23, the Company's secretary, James Loper, was in attendance as part of the Association's group of bargainers and actively participated in those negotiations.

By July 20, the expiration date of the contract then in effect, a new agreement had still not been reached. On July 23 the Union membership voted to reject the latest Association proposals and authorized a strike beginning on July 27 in support of the Union's bargaining position. Actually, the Union membership refused to report for work on the following day, July 24. By a letter dated July 25, which was personally handed to Fatta (the Union representative) the Company unequivocally resigned its membership in the Association and informed both the Union and the Association that it stood by existing Association offers but would thenceforth bargain with the Union on an individual basis.[2] On receipt of this letter, Fatta informed the Company that he regarded its withdrawal from Association-wide bargaining as untimely and, accordingly, would not bargain with it individually. He then

---

2. The Company's letter of July 25 stated:

This is to inform you that as Local 550 Sign and Pictoral [sic] Painters [the Union] and the Houston Sign Manufacturers Assn. has [sic] reached an impasse concerning labor contracts, Hi-Way Billboards, Inc. has resigned from the Houston Sign Manufacturers Assn. and desires to negotiate with Local 550 on an individual basis. The Houston Sign Manufacturers Assn. does no longer represent Hi-Way Billboards Inc. in any manner. Only officers of Hi-Way Billboards, Inc. are authorized to negotiate with Local 550.

Hi-Way Billboards, Inc. will honor the last offer made by the Houston Sign Manufacturers Assn. to the Local 550 as of July 23, 1970. If this offer is unsatisfactory with Local 550, then Hi-Way Billboards, Inc. will meet with representatives of Local 550 at any reasonable place or time to further negotiate upon the basis of the last offer made at the July 23 impasse.

continued to bargain with the Association and, on August 3, concluded an agreement which was signed on August 24. On August 4 the members of the Union met and agreed to end the strike except as against the Company. The record does not show that the Company has ever agreed to the August 3 pact.

The Board's trial examiner found that almost immediately following the Union's strike authorization vote on July 23 the Company withdrew from the group bargaining because of its dissatisfaction with the bargaining fibre of the Association team at a time when the bargaining was about to result in an agreement. Since employer withdrawal from an established multi-employer unit may be permitted in these circumstances only with the consent of the Union, reasoned the trial examiner, and the Union never gave that permission here, he concluded the Company's withdrawal and refusal to accept the agreement of August 3 constituted a refusal to bargain.

Exceptions to the trial examiner's decision were filed by both sides, but the Board found no prejudicial error was committed and affirmed his findings and conclusions. In particular, the Board found that when Loper handed Fatta the letter of the 25th he stated orally that the Association was "weak-kneed" and would come to terms with the Union. The Board concluded the Company decided belatedly to "go it alone" after it was apparent to the Company that the negotiations had taken a turn not to its liking, thus committing the Section 8(a)(5) and (1) violations. In sum, the Board found the company was a member of a multi-employer bargaining unit; that it withdrew from the unit three months after negotiations had commenced on a new Association contract covering the multi-employer unit; that the Union objected to such withdrawal; that there were no special circumstances excusing such withdrawal; and that the Company subsequently refused to sign the Association contract. ▮ The trial examiner heard testimony from a number of witnesses and

singled out that of Mr. Fatta, the Union's business representative and financial secretary, for specific credit. We have carefully reviewed all of the evidence and attached to Mr. Fatta's testimony the full credence which the trial examiner has elected to give it. We are also aware that the Supreme Court, in National Labor Relations Board v. Truck Drivers Local Union No. 449, etc., 1957, 353 U.S. 87, 95–96, 77 S.Ct. 643, 647, 1 L.Ed.2d 676, 681, recognized multi-employer bargaining to be a "vital factor in the effectuation of the national policy of promoting labor peace through strengthened collective bargaining", and observed that "Congress intended ' * * * to leave to the Board's specialized judgment the inevitable questions concerning multi-employer bargaining bound to arise in the future.' * * * " Furthermore, we are not unmindful that the Board has repeatedly held that withdrawal from participation in multi-employer bargaining, which is initially entered into on a voluntary basis, can be accomplished only at an appropriate time and that in the absence of union consent or unusual circumstances, withdrawal is untimely if attempted after the commencement of negotiations. N.L.R.B. v. Tulsa Sheet Metal Works, Inc., 10 Cir. 1966, 367 F. 2d 55, 57. See, N.L.R.B. v. Sheridan Creations, Inc., 2 Cir. 1966, 357 F.2d 245, cert. denied 1967, 385 U.S. 1005, 87 S.Ct. 711, 17 L.Ed.2d 544. Nonetheless, we decide not to enforce the NLRB's order at this particular time because from the entire record we are not convinced that substantial evidence supports the NLRB's key finding that "There were no special circumstances excusing such withdrawal".

It was stipulated by the parties that between May 25, the date of the first bargaining session, and July 23, 1970, the date the Union authorized the strike, there were at least thirteen meetings between the Association and the Union. The passage of time made it clear to all parties that an agreement would not be easy to attain. As a matter of fact, as

early as July 13 Mr. Fatta had told a Mr. Andrews of the Federal Mediation and Conciliation Service that the situation was "very serious." Neither the Union nor the Board alleged any bad faith on the Company's part through July 23. The record is devoid of any evidence remotely indicating that such was the case.

The contract expired at midnight July 19. Mr. Fatta's own testimony sufficiently described the positions of the parties at that point and what later ensued:

"Q. Now, did you seek the help of any third parties or outside agencies in your negotiations?

A. (Mr. Fatta) Yes . . . we could see that their final offer at this particular time . . . we seen that it was getting serious and we contacted Mr. Andrews with the Federal Mediation Service for assistance.

Q. And do you recall when that was?

A. Yes, it was—actually, to tell him [to] set up a meeting, the meeting was set up after we had the sixteenth meeting.

\*   \*   \*   \*   \*   \*

Q. You say that there had been sixteen meetings prior to your contacting Mr. Andrews?

A. I would say roughly about that. I wouldn't stipulate that that was the exact number.

\*   \*   \*   \*   \*   \*

A. And did you meet with the Association and the Mediation Service after you talked to Mr. Andrews?

A. Yes.

Q. Do you recall when that was?

A. Yes, that was on July 20th."

The Union met with the Association at the Mediation Service "all day long" on the 20th "in order to try to come to a closer agreement." The record indicates that the Union was willing to make some concessions on the 20th, but the Association, in Mr. Fatta's terms, "insisted on the wage offer as it was." The Union then asked about applying any new contract retroactively to the 20th in the event the Association rejected these latest Union concessions. Mr. Fatta testified the Association said "definitely not, they would not give us any retroactive pay. Whenever we settled this is when we got our money." Although this position of the Association regarding the retroactive application of the new agreement apparently differed from the practices of past negotiating years, Mr. Fatta urged the Union membership at its July 20 meeting to recess until the 23rd, when they would have another bargaining session with the Association.

Throughout this time the discussions were apparently conducted with all parties assuming that the new contract was to be of three years' duration. At the meeting of the 23rd, however, the Association offered a one-year contract. Mr. Fatta described the situation as it then existed:

"Q. Did the Association at that meeting on the 23rd refuse to accept anything longer than a one-year contract?

A. (Mr. Fatta) They said they didn't want anything. This was more or less an ultimatum, take it or leave it. Then at that particular time Mr. Andrews asked me, aside from the Company, if we would be willing to continue negotiations in light that it looked real bad, if the Company would agree to retroactive pay.

I told Mr. Andrews that we would certainly take it back to the membership and try to recommend that to them, that they continue working, if we could merely go on and know that we were getting our back pay.

And, of course, Mr. Andrews went in and talked to the Association group away from me, and then came back a few minutes later and said that the Company

had refused to pay any retroactive pay at that point.

Q. And were there any further negotiations on that day after you talked to Mr. Andrews?

A. Well, this was toward the end of the meeting that we are talking about there. And from there we went over to the union hall and went into our regular meeting.

Q. And what occurred at the regular meeting of the membership:

A. Well, of course, the membership, we had a lot of talk about it and, of course, it had been no secret what the other crafts had been offered, and it was no secret that they were drawing much more money then we were already, and certainly they couldn't understand this, and it was no way I could explain it to them.

They couldn't understand the situation that there would be no retroactive pay. Therefore, why should they go on? So therefore they voted at that meeting to go on strike.

Q. And did they do so?

A. The following day we refused to work. We didn't set up pickets until Monday.

Q. And who struck generally? What employees went out on strike?

A. We struck all the Association members or just anyone that refused to go along with a retroactive contract up to this point, and going along with whatever was negotiated by the Association."

At another point in his testimony, Mr. Fatta reiterated that a deadlock had in fact existed:

"Q. * * * You testified, Mr. Fatta, about the meeting under the Federal Mediator on July 23. Do you recall that meeting?

A. (Mr. Fatta) Yes.

* * * * * *

Q. Didn't you testify . . . that was an ultimatum, wasn't it, by the Company?

A. As far as I was concerned it was an ultimatum.

Q. That was it, the Company wasn't going to go any further, right?

A. That's right.

Q. And there were going to be no changes?

A. Yes."

On the next day, the 24th, the Company's Mr. Loper called Mr. Fatta to arrange a meeting on the 25th. At that meeting Mr. Loper presented Mr. Fatta with the letter which announced the Company's withdrawal from the Association and its intention thenceforth to bargain with the Union on an individual basis. See Note 2, supra. The trial examiner found that at this meeting Mr. Loper told Mr. Fatta that he knew the Association would shortly reach an accord with the Union because it was "weak-kneed" and susceptible to the Union's demands, which he regarded as being unreasonable. The trial examiner concluded the Company was dissatisfied with the trend of the negotiations and broke from the Association at that time in order to avoid being bound by an inevitable and distasteful agreement.

It is the Board's position that an impasse never in fact existed on the 23rd. It argues that only two days after the alleged impasse Mr. Loper himself acknowledged that the parties were approaching an agreement and, furthermore, less than two weeks following that conversation, the Union and the Association, after resuming negotiations, completed and executed a contract.

But crediting Mr. Fatta's testimony to the full extent that the trial examiner explicitly attached to it, and upon a review of the entire record, we think it apparent that the Association and the Union had indeed on the 23rd reached a deadlock, an impasse. Mr. Fatta himself characterized the Association's last offer as an "ultimatum" and stated that he

did not expect any changes to be made; the Union, on the evening of the 23rd, elected to strike the Association members; and even the Federal mediator saw no point in scheduling another meeting because of the hopelessness of the situation.[3] From the Company's standpoint it was unfortunate that Mr. Loper chose to make the remarks he did to Mr. Fatta. But those comments simply do not comport with the facts as reflected by the record as a whole, especially when considered against the background of Mr. Fatta's description of the posture of the negotiations on the 23rd. Neither are they in agreement with the words the Company chose to use in its July 25 letter:

> This is to inform you that as Local 550 Sign and Pictoral [sic] Painters [the Union] and the Houston Sign Manufacturers Assn. has reached an impasse concerning labor contracts . .

The language which Mr. Loper used to Mr. Fatta on the 25th was the only instance of its kind. This is the sole testimony in the record carrying the least intimation that the Company was breaking away from the Association solely to avoid a particular contract. While we defer to the Board's expertise in these matters, we will not abdicate our responsibility to determine whether the record as a whole contains substantial evidence in support of the finding of a violation of the Act. N.L.R.B. v. Brown, 1965, 380 U.S. 278, 291, 85 S.Ct. 980, 988, 13 L.Ed.2d 839, 849; Universal Camera Corp. v. N.L.R.B., 1950, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456.

It is our conclusion that the language Mr. Loper used to Mr. Fatta was an isolated instance which will not support a conclusion of the absence of an impasse existing between the Union and the Association on the 23rd. To argue that the fact a new contract was agreed to between the Union and the Association *sans* the Company less than two weeks after the events of the 25th is proof of the absence of an impasse on the 23rd itself we view as no more than an afterthought.

■ Convinced as we are that a genuine impasse in the bargaining was reached by the Association and the Union immediately prior to the Company's withdrawal from the multi-employer bargaining unit, we are without an opinion as to the legal consequences of that fact. This is because we have not had the benefit of a considered discussion of that issue by both parties herein subsequent to a decision on the question by the NLRB. Accordingly, we remand this case to the NLRB so that it may be given the first opportunity to decide whether an impasse such as found here excuses the Company from withdrawing from the multi-employer bargaining unit.

■ Finally, the Company argues that the fact of an impasse may be irrelevant where the Union negotiates with the employer after that employer has withdrawn from the multi-employer bargaining unit. This doctrine of "implied consent", which would work to excuse the Company from withdrawal irrespective of an impasse on the theory that the Union retroactively acquiesced to the Company's action, *may be* of significance in another case, but not here. The facts of this case are clear that, just as the Company was unambiguous in its withdrawal from the Association, the Union was unequivocal in its objection to that action. The NLRB found that the post-July 25 contact between the Union and the Company here was not "individual bargaining", but simply an attempt to persuade the Company to sign the Association agreement. We find no error in that decision and, therefore, do not decide here the fate of the "implied consent" doctrine in cases of this type.

Remanded for further Board proceedings consistent with this opinion.

---

3. We iterate that on the 24th the Union members refused to report for work. See Fatta testimony, text, supra.