**NATIONAL LABOR RELATIONS
BOARD, Petitioner,**

v.

**HI–WAY BILLBOARDS, INC.,
Respondent.**

**No. 73–3789.**

United States Court of Appeals,
Fifth Circuit.

Sept. 11, 1974.

Elliott Moore, Deputy Associate Gen. Counsel, John D. Burgoyne, Atty., N.L.R.B., Washington, D. C., Louis V. Baldovin Jr., Director, Region 23, N.L.R.B., Houston, Tex., for petitioner.

Thomas R. Beech, Houston, Tex., for respondent.

Before BROWN, Chief Judge, and RIVES and DYER, Circuit Judges.

RIVES, Circuit Judge:

This case is again here after proceedings following our remand order in NLRB v. Hi-Way Billboards, Inc., 5 Cir., 1973, 473 F.2d 649. We forego a restatement of such facts and circumstances as are not essential for an understanding of this decision.

The Board had applied for enforcement of its order against Hi-Way Billboards, Inc. (hereinafter the Company).[1] The issue presented was whether the Board properly found that the Company violated section 8(a)(5) and (1) of the Act,[2] by refusing to adopt the collective

---

1. The Board's original decision and order are reported at 191 N.L.R.B. 244.

2. National Labor Relations Act as amended, Tit. 29 U.S.C. § 158(a)(1) and (5) provide:

"(a) It shall be an unfair labor practice for an employer—

"(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

"* * *

"(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title."

bargaining agreement negotiated purportedly on its behalf by a multi-employer bargaining association after the Company had attempted to withdraw from the association. This Court recognized that in the absence of Union consent or unusual circumstances a company cannot withdraw from participation in multi-employer bargaining after negotiations have commenced, but the Court was not at that time convinced "that substantial evidence supports the NLRB's key finding that 'There were no special circumstances excusing such withdrawal'." (473 F.2d at 652.)

The Board had found that there was no final impasse. This Court rejected that finding and stated:

"Convinced as we are that a genuine impasse in the bargaining was reached by the Association and the Union immediately prior to the Company's withdrawal·from the multi-employer bargaining unit, we are without an opinion as to the legal consequences of that fact. This is because we have not had the benefit of a considered discussion of that issue by both parties herein subsequent to a decision on the question by the NLRB. Accordingly, we remand this case to the NLRB so that it may be given the first opportunity to decide whether an impasse such as found here excuses the Company from withdrawing from the multi-employer bargaining unit." 473 F.2d at 655.

On remand the Board decided that an employer may not unilaterally withdraw from a multi-employer bargaining unit solely because an impasse in negotiations has been reached. In its supplemental decision and order reported at 206 N.L.R.B. No. 1, the Board gave consideration to the contentions of the parties, summarized by the Board as follows:

"In its statement of position, Hi-Way states that when a genuine impasse is reached in multi-employer bargaining, an individual employer should be allowed, as a right, to withdraw from such bargaining, and

thereafter bargain with the union on an individual basis. Hi-Way further states that the imposition of any other conditions precedent to such withdrawal allows the union to whipsaw members of the multi-employer bargaining unit.

"In his statement of position, the General Counsel states that an impasse in negotiations between a multi-employer bargaining association and a union does not necessarily reflect a breakdown in the bargaining relationship, and it does not warrant hasty and unilateral alteration of the established unit for bargaining. The General Counsel further states that permitting withdrawal solely on the basis of impasse would give little protection to the interests of employees in the unit, since it would encourage employer withdrawal merely because of dissatisfaction with the terms sought by the multi-employer association."

After discussion, the Board concluded:

"Thus, a genuine impasse is akin to a hiatus in negotiations. In the overall ongoing process of collective bargaining, it is merely a point at which the parties cease to negotiate and often resort to forms of economic persuasion to establish the primacy of their negotiating position. Moreover, the occurrence of a genuine impasse cannot be said to be an unexpected, unforeseen, or unusual event in the process of negotiations since no experienced negotiator arrives at the bargaining table with absolute confidence that all of his proposals will be readily and completely accepted. Therefore, it is clear that an impasse is but one thread in the complex tapestry of collective bargaining, rather than a bolt of a different hue. In short, a genuine impasse is not the end of collective bargaining.

"For this reason, a genuine impasse in negotiations between a union and multi-employer bargaining association does not constitute an 'unusual circumstance' within the meaning of that term as applied by us in cases subse-

quent to Retail Associates [120 N.L.R.B. 388, 393–395]. A genuine impasse in such a situation does not call into question the actual continued existence of any multi-employer bargaining association member as a viable business entity. Rather, it is merely a momentary eddy in the flow of collective bargaining. Were we to hold otherwise, we would be denying the practical reality of collective bargaining negotiations, we would herald the demise of multi-employer bargaining, we would effectively negate the benefits of such bargaining to all parties and to employees, and we would allow an employer to seize upon such an occurrence and use it as a ground for withdrawal merely because it was dissatisfied with the impending agreement, as Hi-Way did in the instant case. Consequently, we hold that it would not effectuate the purpose or policies of the Act to allow an employer member of such an association to withdraw solely on the ground that an impasse in negotiations has been reached.

"Accordingly, the Board, having considered the court's opinion, the record, and the statements of position of the parties, has decided to reaffirm its original Order." (Footnote omitted.)

We are impressed with the cogency of the Board's reasoning insofar as the Board's decision would protect the interests of the Union and of the employees in the multi-employer unit. But we have doubts about the fairness of the decision to the employer members of the unit.

In Pacific Coast Association, 1967, 163 N.L.R.B. 892, the Board held in effect that a union may withdraw from a multi-employer unit with respect to one or more employers while continuing multi-employer bargaining with those employers remaining in the multiple unit. So long as such a holding remains effective, it seems to us that the Board's de-

cision in the present case would allow the Union to reach an agreement with one or more employers and to whipsaw the remaining members of the multi-employer bargaining unit.

In the present case the Board noted in its earlier decision that,

"Furthermore, the Union in the instant case accepted the ostensible withdrawal of two other members of the Association, but only upon their agreeing to be bound by any contract reached between the Union and the Association. This, we find, is in effect no withdrawal at all. In addition, Respondents did not learn of the identity of these members until after they (Respondents) had themselves withdrawn."

Those two members also specifically agreed to pay retroactively to the date of the last contract the wages and fringe benefits to be provided in the new agreement.

An unfair whipsaw effect on the Company in the present case is suggested by the testimony of Mr. Fata, the Union representative, quoted in this Court's earlier opinion:

" 'We struck all the Association members or just anyone that refused to go along with a retroactive contract up to this point, and going along with whatever was negotiated by the Association.' " (473 F.2d at 654)[3]

In its brief before the Board on remand, the Company argued:

"The NLRB has clearly established that it is only fair that the same rules governing employer withdrawals from multi-employer bargaining units must be equally applied to union withdrawals. Detroit Evening News Assoc., 154 NLRB 1494 (1965), Retail Associates, Inc., 120 NLRB 388 (1958)."

The Board did not refer to that argument in its decision, but in its brief to this Court it responded as follows:

"As the Company recognizes (S.A.10), the Board has committed itself to

---

3. On oral argument before this Court, it was brought out that not struck were two Asso-ciation members who had agreed to pay retroactive pay from the date of the strike.

applying the same rules concerning the right to withdraw to both employers and unions. The Evening News Association, 154 NLRB 1494, 1495 (1965), enf'd sub nom., Detroit Newspaper Publishers Association v. N.L.R.B., 372 F.2d 569, 570–571 (C.A. 6, 1967). Thus, a union normally can only withdraw if the employer or employers also consent, see N.L.R.B. v. Local 964, United Br. of Carpenters & Joiners, 447 F.2d 643, 645–646 (C.A. 2, 1971); N.L.R.B. v. Brotherhood of Teamsters, etc., Local No. 70, 470 F.2d 509, 510 (C.A. 9, 1972), and therefore, in the absence of consent, the Board would not allow either an employer or a union to withdraw either before or after impasse."

In a case like this one involving a single Union and several employers, the Board's response simply does not ring true so long as the Union may in effect withdraw from the multi-employer association with respect to one or more employers while continuing multi-employer bargaining with those employers remaining in the multiple unit.

The Board's present decision is admittedly opposed to the decision of the Eighth Circuit in Fairmont Foods Company v. N.L.R.B., 1972, 471 F.2d 1170, 1172–1174.[4]

The Board's present decision is at variance with its earlier decision in Morand Brothers Beverage Co., 91 N.L.R.B. 409, 417–418 (1950), enf'd in part and remanded in part, 190 F.2d 576 (C.A. 7, 1951). It may be, as the Board argues, that since Retail Associates, Inc., 120 N.L.R.B. 388, 393–394 (1958) *Morand* is not a viable decision. However, if the Board desires to announce a different presently prevailing rule, that rule cannot be given retroactive effect by this Court unless that effect is fair to the Company as well as to the Union. We cannot escape the view that enforcement of the Board's order would be unfair to the Company.

We therefore conclude that substantial evidence on the record as a whole does not support the Board's finding that the Company violated section 8(a)(5) and (1) of the Act by refusing to adopt the collective bargaining agreement negotiated purportedly on its behalf by a multi-employer bargaining association.

Enforcement denied.

---

4. Footnote 1 at p. 1174 in pertinent part reads:

"We find it particularly incongruous that the Board refused to uphold the withdrawal of Fairmont from the negotiations while impliedly approving the Union's negotiation of separate contracts with three of the members of the Association during the impasse. While it is claimed that these contracts were merely interim agreements which were intended to be merged later into the Association agreement, the written agreement with Country House, Inc. was used as the basis for withdrawing the pickets from that employer's premises * * *."