630 F.2d 25
 105 L.R.R.M. (BNA) 2477, 89 Lab.Cas. P 12,234
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
and
Teamsters Local Union No. 25, International Brotherhood of
Teamsters, Chauffeurs, Warehousemen and Helpers of
America, Intervenor,
v.
CHARLES D. BONANNO LINEN SERVICE, INC., Respondent.
 No. 79-1524.
 United States Court of Appeals,
First Circuit.
 Argued May 6, 1980.
Decided Sept. 12, 1980.
 
 John G. Elligers, Atty., Washington, D. C., with whom William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel and Standau E. Weinbrecht, Atty., Washington, D. C., were on brief, for petitioner.
 Sidney A. Coven, Boston, Mass., with whom Howard I. Wilgoren and Lepie & Coven, Boston, Mass., were on brief, for respondent.
 James T. Grady, Boston, Mass., with whom Gabriel O. Dumont, Jr. and Grady & McDonald, Boston, Mass., were on brief, for intervenor.
 Before CAMPBELL and BOWNES, Circuit Judges, and DAVIS, Judge.*
 BOWNES, Circuit Judge.
 
 
 1
 Pursuant to § 10(e) of the National Labor Relations Act, 29 U.S.C. § 160(e), the National Labor Relations Board (the Board) petitions for enforcement of a decision[1] which it concedes is contrary to the pronouncements of five circuit courts. At issue is whether the occurrence of an impasse in the course of collective bargaining enables an employer unilaterally to withdraw from a multiemployer bargaining unit and thereafter negotiate with the union on an individual basis. Rejecting the various court decisions indicating otherwise as misguided, the Board concluded that an employer's withdrawal upon occurrence of a bargaining impasse is unjustified and violative of §§ 8(a)(5) and (1) of the Act. In so holding, the Board reaffirmed a position to which it has tenaciously adhered since 1973. For the reasons set forth below, we enforce the Board's order.
 
 I.
 
 2
 The factual findings of the Administrative Law Judge are undisputed. Charles D. Bonanno Linen Service, Inc. (Bonanno) is a Massachusetts corporation engaged in the laundering, rental and distribution of linen products. The truck drivers and helpers employed by Bonanno, as well as by other linen supply companies in the area, have been represented by the Teamsters Local Union No. 25 (the Union). For the purpose of negotiating with the Union concerning the terms of employment of these workers, Bonanno for several years has joined with nine of its competitors in a multiemployer unit called the New England Linen Supply Association (the Association). Bonanno was a signatory to the most recent contract negotiated between the Association and the Union, which covered the period from September 21, 1972, to April 18, 1975. On February 19, 1975, Bonanno authorized the Association's negotiating committee to represent it in the anticipated negotiations for a new contract, and Bonanno's president became a member of that committee.
 
 
 3
 The Union and the Association held bargaining sessions throughout March and April of 1975. On April 30, a proposed contract was agreed upon by the negotiators, but was rejected by the Union members four days later. By May 15, the parties had reached an impasse over the issue of compensation: the Union demanded that the employees be paid on a commission basis, while the Association insisted that they continue to receive payment at an hourly rate. When several subsequent meetings proved unsuccessful in breaking the impasse, the Union on June 23 initiated a selective strike against Bonanno. In response, most of the Association members locked out their drivers. The stalemate continued throughout the summer, with the negotiators unable to agree upon a method of payment during their sporadic meetings. During this time, two employers secretly conferred with the Union, "presumably in an effort to make a separate settlement." No such agreement, however, was executed, nor was there any evidence that these contacts even reached the level of negotiations.
 
 
 4
 On November 21, by which time it had hired permanent replacements for all of its striking drivers, Bonanno notified the Association by letter that it was "withdrawing from the Association with specific respect to negotiations at this time because of an ongoing impasse with Teamsters Local 25." On the same day Bonanno mailed a copy of its revocation letter to the Union and read it over the phone to a Union representative. Shortly thereafter, the Association terminated the lockout and informed the Union that it wished to continue negotiations on a multiemployer basis. Several negotiating sessions were conducted between December and April. On April 13, 1976, the Union abandoned its demand for payment by commission and accepted a management offer of a revised hourly wage rate. With this development, the parties quickly reached agreement on a new contract, dated April 23, 1976, and given retroactive effect to April 18, 1975.
 
 
 5
 On April 9, 1976, the Union filed the present action, alleging that Bonanno's purported withdrawal from the multiemployer bargaining unit constituted an unfair labor practice. By letter dated April 29, 1976, the Union for the first time informed Bonanno that the Union had never consented to its withdrawal and therefore considered Bonanno to be bound by the settlement just reached. Bonanno denied it was bound by the contract in a reply letter dated May 3, 1976.
 
 II.
 
 6
 Crucial to any examination of the right of withdrawal from a multiemployer bargaining arrangement is an understanding of the private and public interests served by such an arrangement and the extent to which those interests would be undermined were a party free at any time to withdraw from the multiemployer unit. Multiemployer bargaining offers advantages to both management and labor. It enables smaller employers to bargain "on an equal basis with a large union" and avoid "the competitive disadvantages resulting from nonuniform contractual terms." NLRB v. Truck Drivers Local 449, 353 U.S. 87, 96, 77 S.Ct. 643, 647, 1 L.Ed.2d 676 (1957). At the same time, it facilitates the development of industry-wide, worker benefit programs that employers otherwise might be unable to provide. More generally, multiemployer bargaining encourages both sides to adopt a flexible attitude during negotiations; as the Board explains, employers can make concessions "without fear that other employers will refuse to make similar concessions to achieve a competitive advantage," and a union can act similarly "without fear that the employees will be dissatisfied at not receiving the same benefits which the union might win from other employers." Brief at 10. Finally, by permitting the union and employers to concentrate their bargaining resources on the negotiation of a single contract, multiemployer bargaining enhances the efficiency and effectiveness of the collective bargaining process and thereby reduces industrial strife. For these reasons, Congress has recognized multiemployer bargaining as "a vital factor in the effectuation of the national policy of promoting labor peace through strengthened collective bargaining." NLRB v. Truck Drivers Local 449, 353 U.S. at 95, 77 S.Ct. at 647.
 
 
 7
 It is apparent that, absent some constraints on the parties' freedom to withdraw from a multiemployer unit during the course of negotiations, the utility of this bargaining process would be substantially undermined. Withdrawal by unit members and their negotiation of separate contracts obviously would reduce the efficiency of the bargaining process. Perhaps more importantly, if the withdrawing members were successful in obtaining more favorable contractual terms, their competitive advantage would encourage additional defections. In order to forestall such withdrawals, the unit's bargaining representative likely would adopt a more extreme position and a more intransigent approach, thereby diminishing the likelihood of a prompt and peaceful settlement. At the same time, a flat prohibition on withdrawal from a multiemployer unit during negotiations would be equally troublesome: such a rule would subvert each employer's interest in controlling its own labor relations, would cause injustice whenever an employer developed a unique situation requiring individualized treatment, and would undermine the multiemployer bargaining process itself by discouraging involvement therein.
 
 
 8
 In an effort to balance these competing concerns, the Board in Retail Associates, Inc., 120 NLRB 388 (1958), prescribed guidelines to govern withdrawal from multiemployer bargaining. Under these rules, an employer or union is free to withdraw from the multiemployer unit for any reason prior to the date set for renegotiation of the existing contract or the date on which negotiations actually commence, provided adequate written notice is given. Once negotiations towards a new contract have begun, however, a party may only withdraw if "mutual consent" is given or if "unusual circumstances" exist. Id. at 395 (dictum). This approach affords each party an opportunity to rescind its consent to multiemployer bargaining, but restricts unilateral withdrawal during the period when such action would jeopardize the viability and effectiveness of the bargaining process. Even then, however, a necessary measure of flexibility is provided by the "mutual consent" and "unusual circumstances" exceptions. We have recently endorsed the Retail Associates approach to multiemployer withdrawal.[2] See Carvel Co. v. NLRB, 560 F.2d 1030, 1034-35 (1st Cir. 1977), cert. denied, 434 U.S. 1065, 98 S.Ct. 1240, 55 L.Ed.2d 766 (1978); accord, e. g., McAx Sign Co., Inc. v. NLRB, 576 F.2d 62, 67-68 (5th Cir. 1978), cert. denied, 439 U.S. 1116, 99 S.Ct. 1021, 59 L.Ed.2d 75 (1979); NLRB v. Sheridan Creations, Inc., 357 F.2d 245, 247-48 (1966), cert. denied, 385 U.S. 1005, 87 S.Ct. 711, 17 L.Ed.2d 544 (1967).
 
 
 9
 Since its delineation of the Retail Associates guidelines, the Board, with judicial approval, has consistently found "unusual circumstances" to exist in two situations: where extreme financial pressures, such as impending bankruptcy, have threatened an employer's existence,[3] and where the bargaining unit has been substantially fragmented, such as through consensual withdrawals.[4] Whether the "unusual circumstances" exception also encompasses a bargaining impasse-the issue presented here-has invoked a more varied response. For many years, the Board failed to provide a clear-cut answer, first implying that impasse would not justify unilateral withdrawal, see Ice Cream, Frozen Custard Indus. Employees, 145 NLRB 865, 870 (1964), only to suggest later that it would. See Plumbers & Steamfitters Local 323, 191 NLRB 592, 592 n.1 (1971). In 1973, however, the Board unequivocally ruled that a bargaining impasse was not an "unusual circumstance" within the Retail Associates guidelines. Hi-Way Billboards, Inc., 206 NLRB 22 (1973), enforcement denied, 500 F.2d 181 (5th Cir. 1974). It reasoned that an impasse did not signify the end of collective bargaining, but rather was a foreseeable stage in the bargaining process-"akin to a hiatus in negotiations"-which permitted the parties to "resort to forms of economic persuasion to establish the primacy of their negotiating position." Id. at 23. A rule permitting unilateral withdrawal upon impasse, the Board added, would "herald the demise of multiemployer bargaining," since a member could avoid its bargaining obligations by purposefully creating an impasse whenever "it was dissatisfied with the impending agreement." Id. at 23-24. Notwithstanding the Fifth Circuit's refusal to enforce the Hi-Way Billboards decision, 500 F.2d 181 (5th Cir. 1974), as well as subsequent expressions of judicial disapproval, the Board has tenaciously adhered to this position ever since[5] and has provided a spirited defense thereof in the instant case. 243 NLRB No. 140, 1979-80 CCH NLRB P 16,090 (1979).
 
 
 10
 As the Board concedes, there are a number of appellate decisions that conclude, after analysis, that the occurrence of a genuine impasse does justify an employer's unilateral withdrawal from a multiemployer bargaining unit.[6] See NLRB v. Independent Ass'n of Steel Fabricators, Inc., 582 F.2d 135, 146 (2d Cir. 1978), cert. denied, 439 U.S. 1130, 99 S.Ct. 1049, 59 L.Ed.2d 91 (1979); NLRB v. Beck Engraving Co., Inc., 522 F.2d 475, 483 (3d Cir. 1975); NLRB v. Associated Shower Door Co., Inc., 512 F.2d 230, 232 (9th Cir.), cert. denied, 423 U.S. 893, 96 S.Ct. 191, 46 L.Ed.2d 125 (1975) (dictum); NLRB v. Hi-Way Billboards, Inc., 500 F.2d 181, 183-84 (5th Cir. 1974); Fairmont Foods Co. v. NLRB, 471 F.2d 1170, 1172 (8th Cir. 1972) (alternative holding). In fact, in its supplemental decision below, the Board endeavored at some length to rebut this line of cases as misguided and unpersuasive. Upon close analysis, however, all but one of these cases prove inapposite to, or otherwise distinguishable from, the situation at hand.
 
 III.
 
 11
 Fairmont Foods Co. v. NLRB, 471 F.2d 1170 (8th Cir. 1972)-the first case to rule that an impasse justifies withdrawal-was decided prior to the Board's Hi-Way Billboards decision, at a time when its pronouncements on this issue were ambiguous and even contradictory. The court reached this conclusion, in the course of rejecting the Board's factual determination that no impasse existed, by relying on Morand Bros. Beverage Co., 91 NLRB 409 (1950), enforced in part, 190 F.2d 576 (7th Cir. 1951)-a decision which the Board below characterized as "no longer valid."[7] More importantly, the Board in Fairmont Foods had adopted the trial examiner's rulings which themselves suggested that an impasse would justify withdrawal. 196 NLRB 849, 856 (1972). In reaching the same result, therefore, the Eighth Circuit was merely articulating its perception of Board policy in effect at the time-a policy which the Board subsequently revamped in Hi-Way Billboards.
 
 
 12
 Three of the four remaining cases involved very similar factual settings. In NLRB v. Hi-Way Billboards, Inc., 500 F.2d 181 (5th Cir. 1974), a negotiating impasse had been reached, a strike had been called, and the union had signed "interim" agreements with several members of the multiemployer unit. These agreements permitted the several employers to resume operations but required them to adhere to any unit-wide contract ultimately negotiated. The same circumstances existed in NLRB v. Associated Shower Door Co., Inc., 512 F.2d 230 (9th Cir.), cert. denied, 423 U.S. 893, 96 S.Ct. 191, 46 L.Ed.2d 125 (1975), and NLRB v. Independent Ass'n of Steel Fabricators, Inc., 582 F.2d 135 (2d Cir. 1978), cert. denied, 439 U.S. 1130, 99 S.Ct. 1049, 59 L.Ed.2d 91 (1979), except that the individual agreements negotiated by the several employers were not interim in nature, but were final contracts designed to remain in effect regardless of the outcome of the group bargaining. In each case, a second group of multiemployer members asserted a right to withdraw unilaterally from the unit in response to such agreements; in each case, the court rejected the Board's ruling and held that the employers were entitled to withdraw and thus were not bound by the subsequently negotiated multiemployer agreement.[8]
 
 
 13
 Employing a similar analysis, the courts concluded in essence that a contrary result would be unfair to the employers comprising the bargaining unit.[9] Crucial to this assessment was the Board policy that, once negotiations have begun, "a union may withdraw from a multi-employer unit with respect to one or more employers while continuing multi-employer bargaining with those employers remaining in the multiple unit." NLRB v. Hi-Way Billboards, Inc., 500 F.2d at 183.[10] One concern was that this policy appeared to undercut the principle espoused in Evening News Assoc., 154 NLRB 1494 (1965), enforced sub nom., Detroit Newspaper Publishers Assoc. v. NLRB, 372 F.2d 569 (6th Cir. 1967), that all rules governing the right of withdrawal in the multiemployer context would be applied equally among employers and unions. But the greater concern was the impact of this policy on the remaining members of the multiemployer group, "who watched certain of their withdrawing competitors resume business while they themselves were still in the throes of an economic strike." NLRB v. Independent Ass'n of Steel Fabricators, Inc., 582 F.2d at 147. The anticipated result of this arrangement, which all three courts deemed unacceptable, was that "a union could reach an agreement with one or more employers and then whipsaw the remaining members of the significantly fragmented and weakened multi-employer unit." NLRB v. Associated Shower Door Co., Inc., 512 F.2d at 232, quoted in NLRB v. Independent Ass'n of Steel Fabricators, Inc., 582 F.2d at 147 n.21; accord, NLRB v. Hi-Way Billboards, Inc., 500 F.2d at 183. At bottom, then, was a dissatisfaction with a perceived imbalance in relative bargaining strength.[11] In NLRB v. Beck Engraving Co., Inc., 522 F.2d 475 (3d Cir. 1975), a case we discuss infra, the Third Circuit articulated this concern most emphatically: "The union, under the Board's own policy, should not have been given two weapons for its economic arsenal (i. e. the selective strike and individual negotiations) while the employers are given only one (viz., the lockout)." Id. at 483. Although acknowledging that its decision would "contribute . . . to instability within the context of multi-employer bargaining," id., the Beck court deemed it necessary, as did the other courts, to correct this imbalance by supplying the employers with a second weapon: the ability to withdraw from a multiemployer group upon impasse.[12]
 
 
 14
 For several reasons, we feel the approach adopted by these four courts is questionable. First, the Supreme Court has indicated that the legitimacy of any particular bargaining tactic or weapon should be based solely on the pertinent statutory provisions, and not on any assessment of relative bargaining strength.[13] As a result, the balance of economic power arguably should have little bearing on the question whether impasse justifies withdrawal.[14] Second, even if a cataloguing of economic weapons were appropriate, the final tallies reached here are incomplete. The Beck court's two-to-one tabulation ignores, on the one hand, a union's ability to institute consumer picketing and to engage in "harassing tactics," NLRB v. Insurance Agents' Int'l Union, 361 U.S. 477, 480-81, 80 S.Ct. 419, 422, 4 L.Ed.2d 454 (1960), and on the other an employer's ability, inter alia, to "legitimately blunt the effectiveness of an anticipated strike by stockpiling inventories, readjusting contract schedules, or transferring work from one plant to another ...." NLRB v. Brown, 380 U.S. 278, 283, 85 S.Ct. 980, 984, 13 L.Ed.2d 839 (1965).[15] The balancing undertaken is thus somewhat imprecise.
 
 
 15
 Of course, the additional weapons in the employer arsenal are useful primarily in resisting a strike, and the fact remains that employers have no direct means of countering the union's ability to negotiate individual agreements. But upon analysis, we question whether this right of the union-at least as currently defined by the Board-constitutes as formidable a weapon, and creates as marked a disparity in bargaining power, as the courts suggest. Contrary to the implication in Associated Shower Door, 512 F.2d at 232, and Hi-Way Billboards, 500 F.2d at 183, the Board has not granted the unions unlimited withdrawal rights. Rather, the economic weapon at stake consists solely of the union's ability to negotiate "interim" agreements[16]-temporary settlements that will be superseded by any unit-wide contract ultimately negotiated.[17] There is little doubt that, through the selective use of this device in combination with a general strike, a union is capable of exerting some degree of uneven economic pressure-a whipsaw effect-on certain employers. But there is much to be said for the Board's position. As demonstrated by the lawfulness of such weapons as the selective strike, the uneven application of economic pressure per se is not inconsistent with multiemployer bargaining. In addition, the whipsaw effect resulting from a general strike coupled with one or more interim agreements corresponds closely to that arising from a selective strike followed by a partial employer lockout.[18] Because courts have seen no reason to fashion an additional weapon for employers in the latter instance, we question the necessity of doing so in the former.
 
 
 16
 But regardless of the propriety of the analytical approach adopted in Hi-Way Billboards, Shower Door, and Steel Fabricators, it is apparent that the three decisions hinged on the belief that the negotiation of individual agreements had unfairly tipped the balance of bargaining power, and not on any conviction that impasse alone justifies unilateral withdrawal.[19] This critical element is absent in the present case; as the Board stated, "no interim agreements were made or even attempted." Accordingly, these three decisions do not control our analysis.
 
 
 17
 By contrast, the Beck case is squarely on point. One member of a multiemployer unit there attempted to withdraw following the occurrence of an impasse and a selective strike. Notwithstanding that the union had made no attempt to negotiate individual agreements,[20] the court upheld the employer's withdrawal. It reasoned:
 
 
 18
 The employer's right to withdraw during a bargaining impasse cannot be made contingent upon the union's prior exercise of its right to negotiate individual interim agreements. The rights of the parties should accrue simultaneously based upon the occurrence of an event which neither can manipulate (e. g., impasse). Were the rule otherwise, the party whose right accrues first would be given a tremendous bargaining advantage and leverage.
 
 
 19
 522 F.2d at 483. For several reasons, we find this rationale unpersuasive.
 
 
 20
 First, contrary to the court's premise, the Board has not in the past conditioned the ability of a union to negotiate interim agreements upon the existence of a bargaining impasse. The Board sanctioned the use of such agreements in Sangamo Constr. Co., 188 NLRB 159 (1971), for example, notwithstanding the absence of any finding that an impasse had occurred. Id. at 160 ("bargaining did continue during the operative period").[21] Even if some right of withdrawal is necessary to counterbalance the union's ability to negotiate interim agreements, therefore, there is little reason to link it to the existence of an impasse.[22] Second, the court's characterization of an impasse as an event that neither party can "manipulate" appears unrealistic, or at least the Board could permissibly so conclude. It is true that a party's general adoption of a "take it or leave it" attitude would violate the statutory obligation to bargain in good faith. See generally NLRB v. Insurance Agents' Int'l Union, 361 U.S. at 483-87, 80 S.Ct. at 423-26. But the Act expressly provides that the "obligation (to bargain collectively) does not compel either party to agree to a proposal or require the making of a concession." 29 U.S.C. § 158(d). We thus think it within the power of an employer or union in many cases to cause a stalemate, as by adhering to a position known to be unacceptable to the other side. To the extent this is possible, the Beck rule provides a party with a means of withdrawing whenever the impending agreement proves objectionable.[23] Third, because a precise formula for determining when a genuine impasse occurs has not been-and perhaps cannot be-formulated,[24] tying the right of withdrawal to this event can only lead to confusion concerning the rights of the parties. Finally, we feel that the Beck decision, and indeed the other cases as well, fail to accord sufficient weight to the policy of preserving the stability of multiemployer bargaining-a "vital factor" in promoting labor peace. NLRB v. Truck Drivers Local 449, 353 U.S. at 95, 77 S.Ct. at 647. The Board could find that any rule permitting unilateral withdrawal upon impasse unnecessarily increases the opportunities for the dissolution of such bargaining units and thereby undermines an effective tool of labor relations.
 
 
 21
 Congress "intended to leave to the Board's specialized judgment the inevitable questions concerning multi-employer bargaining (which are) bound to arise . . . ." Id. at 96, 77 S.Ct. at 647. As a result, the Board's "balancing of the conflicting legitimate interests (is) subject to limited judicial review." Id. (footnote omitted).[25] In the present case, we think the Board has struck a reasonable balance in concluding that impasse alone does not justify unilateral withdrawal.
 
 IV.
 
 22
 Bonanno's remaining contention-that the Union consented to or otherwise acquiesced in its withdrawal-can be dismissed more summarily. In support thereof, Bonanno notes that the Union (1) did not explicitly object to its announced withdrawal on November 21, 1975, (2) continued to negotiate with the Association representatives, at one point inquiring as to who had replaced Bonanno on the committee, and (3) did not formally protest the attempted withdrawal until April 29, 1976, more than two weeks after a unit-wide agreement had been reached. These facts provide an insufficient basis to disturb the trial examiner's findings. A union is "under no duty to 'protest' (an employer's attempted withdrawal) in any formal manner . . . ." NLRB v. John J. Corbett Press, Inc., 401 F.2d 673, 675 (2d Cir. 1968). Here, the Union representative responded that he would have to consult with the Union attorney-certainly an indication more of opposition than of acquiescence. And although the Union's course of conduct can evidence implied consent, such conduct "usually must involve a course of affirmative action clearly antithetical to" the claim that no withdrawal has occurred. I.C. Refrigeration Service, 200 NLRB 687, 689 (1972). In the present case, that the Union made no attempt to negotiate individually with Bonanno, see id., that a unit-wide agreement was not reached shortly after Bonanno's action, compare, e. g., Fairmont Foods Co. v. NLRB, 471 F.2d at 1173, and that the Union filed unfair labor practice charges on April 9, 1976 with respect thereto, all serve to negate any suggestion of Union acquiescence in Bonanno's untimely and-we rule-unlawful attempt to withdraw from the Association.
 
 
 23
 Enforcement granted.
 
 
 24
 LEVIN H. CAMPBELL, Circuit Judge (concurring).
 
 
 25
 While I join in the ultimate conclusion of the court, namely, that "the Board has struck a reasonable balance in concluding that impasse alone does not justify unilateral withdrawal" (emphasis added), I emphasize that we are not here presented with the question whether, after the occurrence of both an impasse and the negotiation of interim agreements, an employer may unilaterally withdraw from a multi-employer group; accordingly, I would express no opinion on the resolution of the latter question, and do not join in the court's dicta on this interesting but nonessential matter.
 
 
 
 *
 Of the United States Court of Claims, sitting by designation
 
 
 [1]
 The Board actually filed two decisions in this case. The first, issued on May 12, 1977 and reported at 229 NLRB 629 (1977), was a summary affirmance of the Administrative Law Judge's opinion and order. The Board subsequently sought leave to reconsider its decision, and for that reason we suspended the respondent's petition for review on October 26, 1977. On August 6, 1979, the Board affirmed its initial opinion in a supplemental decision, reported at 243 NLRB No. 140, 1979-80 CCH NLRB P 16,090 (1979), enforcement of which is now sought
 
 
 [2]
 Although in NLRB v. Field & Sons, Inc., 462 F.2d 748, 749-50 (1st Cir. 1972), we expressed some hesitation concerning the inflexibility of the Board's approach, we subsequently disapproved of this dictum in Carvel Co. v. NLRB, 560 F.2d at 1035
 
 
 [3]
 See, e. g., Atlas Electrical Service Co., 176 NLRB 827, 830 (1969); Spun-Jee Corp., 171 NLRB 557, 558 (1968); United States Lingerie Corp., 170 NLRB 750, 751 (1968). Compare, e. g., Universal Insulation Corp., 149 NLRB 1397, 1403 (1964), enforced, 361 F.2d 406 (6th Cir. 1966) (mere economic hardship resulting from multiemployer agreement not grounds for withdrawal)
 
 
 [4]
 See, e. g., NLRB v. Southwestern Colorado Contractors' Ass'n, 447 F.2d 968, 969-70 (10th Cir. 1971); Typographic Service Co., 238 NLRB No. 211, 1978-79 CCH NLRB P 15,096 (1978); Connell Typesetting Co., 212 NLRB 918, 921 (1974)
 Although the Board apparently has never so held, several courts have also found "unusual circumstances" in instances where the negotiating committee does not fairly represent the interests of an employer. See NLRB v. Siebler Heating & Air Conditioning, Inc., 563 F.2d 366, 371 (8th Cir. 1977), cert. denied, 437 U.S. 911, 98 S.Ct. 3104, 57 L.Ed.2d 1142 (1978); NLRB v. Unelko Corp., 71 Lab.Cas. P 13,764 (7th Cir. 1973) (dictum).
 
 
 [5]
 See, e. g., Seattle Auto Glass, 246 NLRB No. 21, 1979-80 CCH NLRB P 16,366 (1979); Golden Bear Motors, Inc., 245 NLRB No. 30, 1979-80 CCH NLRB P 16,315 (1979); Marine Machine Works, Inc., 243 NLRB No. 141, 1979-80 CCH NLRB P 16,089 (1979); Florida Fire Sprinklers, Inc., 237 NLRB 1034, 1035 (1978); Bill Cook Buick, Inc., 224 NLRB 1094, 1096 (1976)
 
 
 [6]
 In addition, there are several cases-including one of our own-that express the same view in dictum, citing without analysis to one or more of the cases listed in the text. See Jaime Andino d/b/a Jaime Andino Trucking, 619 F.2d 147 at 151 (1st Cir. 1980); Authorized Air Conditioning Co., Inc. v. NLRB, 606 F.2d 899, 907 (9th Cir. 1979), cert. denied, --- U.S. ----, 100 S.Ct. 1598, 63 L.Ed.2d 785 (1980); NLRB v. Acme Wire Works, Inc., 582 F.2d 153, 156-57 (2d Cir. 1978)
 
 
 [7]
 Reasoning that the withdrawal rights of unions and employers should be at least similar if not coextensive, the Board in Morand accorded to unions the right to withdraw upon impasse after noting that, under its prior decisions, employers had "unlimited freedom" to withdraw "at any time . . . at their will or fancy." 91 NLRB at 418. The Board subsequently abandoned this hands-off approach in Retail Associates
 The Fairmont Foods court also relied, erroneously, on Ice Cream, Frozen Custard Indus. Employees, 145 NLRB 865 (1964). The Board's decision there, although ambiguous, suggested that an employer could withdraw upon impasse only if the union consented, id. at 870-a position first enunciated in Retail Associates.
 
 
 [8]
 In Associated Shower Door, however, the Ninth Circuit enforced the decision on alternative grounds, agreeing with the Board's conclusion that the withdrawing members' subsequent conduct constituted a "retraction" of their withdrawals. 512 F.2d at 232-33
 
 
 [9]
 See NLRB v. Associated Shower Door Co., Inc., 512 F.2d at 232 ("it seems only fair" that withdrawal should be allowed under the circumstances); NLRB v. Hi-Way Billboards, Inc., 500 F.2d at 183 ("we have doubts about the fairness of the decision to the employer members of the unit")
 
 
 [10]
 The Hi-Way Billboards and Associated Shower Door courts erroneously relied on Pacific Coast Ass'n of Pulp & Paper Manufs., 163 NLRB 892 (1967), to support this proposition. There, the Board merely upheld the right of unions to withdraw prior to the start of negotiations-a straightforward application of the Retail Associates guidelines. The quoted statement is nonetheless an accurate description of Board policy, with one qualification which we discuss below. See nn. 16 & 17 infra
 
 
 [11]
 As an alternative basis for its conclusion that impasse justifies withdrawal, the Steel Fabricators court indicated that "the objectives of collective bargaining would be ill-served by compelling employers to remain in the bargaining unit once it becomes clear that no progress is being made within that framework." 582 F.2d at 146. This result-oriented approach sacrifices the long-term value of stable multiemployer bargaining to the immediate goal of expediting the collective bargaining process. See Note, 45 Brooklyn L.Rev. 1283, 1305, 1317-18 (1979). It also, contrary to the Board's opinion, regards impasse as an unexpected and aberrant occurrence which signifies an irretrievable collapse in negotiations, rather than as a predictable, often temporary, and occasionally purposefully created stage in the bargaining process. Given the public and private interests served by multiemployer bargaining and the Board's expertise, we consider the Second Circuit's rationale an insufficient justification by itself to override the Board's considered judgment
 
 
 [12]
 The court in Beck suggested that the Board might prefer to effect an alternative equilibrium by forbidding unions from negotiating individual agreements. 522 F.2d at 484 n.15
 
 
 [13]
 See American Ship Building Co. v. NLRB, 380 U.S. 300, 317, 85 S.Ct. 955, 966, 13 L.Ed.2d 855 (1965) (the Act does not "give the Board a general authority to assess the relative economic power of the adversaries in the bargaining process and to deny weapons to one party or the other because of its assessment of that party's bargaining power."); NLRB v. Brown, 380 U.S. 278, 85 S.Ct. 980, 13 L.Ed.2d 839 (1965); NLRB v. Insurance Agents' Int'l Union, 361 U.S. 477, 490, 497, 80 S.Ct. 419, 427, 431, 4 L.Ed.2d 454 (1960). This restriction, designed to effectuate the congressional intent that the Board not control the substantive terms of any collective bargaining agreement, id. at 485-87, 80 S.Ct. at 425, apparently encompasses judicial actions as well: the Court in Insurance Agents indicated that the "substantive solution" of the parties' differences should be "unrestricted by any governmental power." Id. at 488, 80 S.Ct. at 426
 
 
 [14]
 See Murphy, Impasse and the Duty to Bargain in Good Faith, 39 U.Pitt.L.Rev. 1, 60 (1977); Comment, 17 B.C.Indus. & Com.L.Rev. 525, 536-37 (1976)
 
 
 [15]
 The sole employer weapon mentioned by the courts-the lockout-is itself a multi-faceted device. Not only can the nonstruck members of a multiemployer unit lock out their employees as a defense to a whipsaw strike against other unit members, NLRB v. Truck Drivers Local 449, 353 U.S. 87, 77 S.Ct. 643, 1 L.Ed.2d 676 (1957), but the struck members can hire permanent replacements, NLRB v. Mackay Radio & Tel. Co., 304 U.S. 333, 345-46, 58 S.Ct. 904, 911, 82 L.Ed. 1381 (1938), and the nonstruck members can hire temporary replacements, NLRB v. Brown, 380 U.S. 278, 85 S.Ct. 980, 13 L.Ed.2d 839 (1965), thereby resuming normal operations. Moreover, even in the absence of a strike, all employers can use the lockout offensively to exert economic pressure on a union. American Ship Building Co. v. NLRB, 380 U.S. 300, 85 S.Ct. 955, 13 L.Ed.2d 855 (1964)
 
 
 [16]
 To be distinguished are "separate" agreements, defined as final contracts entirely divorced from the multiemployer process. The Board has disapproved of a union's negotiation of separate contracts with group members, considering such conduct antithetical to and destructive of the multiemployer bargaining process. As a result, in most cases where one or more group members have reached separate agreements with the union, the Board has permitted the remaining members to withdraw. See, e. g., Typographic Service Co., 238 NLRB No. 211, 1978-79 CCH NLRB P 15,096, at 28,319 (1978); Connell Typesetting Co., 212 NLRB 918, 921 (1974). The exception consists of situations where the union's conduct neither "proves an intention to destroy, (n)or necessarily causes the fragmentation of, a multiemployer unit." Tobey Fine Papers, 245 NLRB No. 181, 1979-80 CCH NLRB P 16,330, at 30,539. Significantly, the Board has recently held that an employer's ability to negotiate a separate agreement is dependent on the consent of the multiemployer group. Teamsters Local 378, 243 NLRB No. 138, 1979-80 CCH NLRB P 16,087 (1979). The employers can thus effectively prevent any of their members from defecting in the first place-an alternative that ensures the continued viability of the multiemployer group
 
 
 [17]
 In the Board's view, interim agreements neither fragment nor significantly weaken the multiemployer unit, and indeed do not represent withdrawals at all, since the signatories retain a vested interest in the outcome of group negotiations. Of course, even the Board has acknowledged that a party to such an agreement, having alleviated its immediate concerns and quite possibly enjoying a competitive surge relative to its struck counterparts, is less likely to push for a prompt settlement or otherwise share the group's bargaining strategies, see Connell Typesetting Co., 212 NLRB at 921; in that sense, its strength at the negotiating table will have diminished. But by promising adherence to the ultimate unit-wide contract, a signatory cannot ignore entirely the ongoing negotiations. For this reason, we cannot subscribe to the Third Circuit's view that "allowing individual negotiations even on an interim basis is tantamount to a rejection of the existence of the multi-employer bargaining unit." NLRB v. Beck Engraving Co., Inc., 522 F.2d at 483. Although interim agreements may not enhance the integrity of the bargaining unit, they seem unlikely to undermine it significantly
 Interim agreements are considered useful in facilitating the breaking of a stalemate and in providing a safety valve for employers particularly vulnerable to strike pressure. The Board has thus sanctioned the use of these arguments and has barred other employers from unilaterally withdrawing from the bargaining unit in response thereto. See, e. g., Joseph J. Callier d/b/a Callier's Custom Kitchens, 243 NLRB No. 143, 1979-80 CCH NLRB P 16,104, at 30,135 (1979); Sangamo Constr. Co., 188 NLRB 159, 160 (1971). The Board has also suggested, however, that an "unusual circumstance" permitting withdrawal might arise even here if interim agreements are negotiated on such a scale or on such terms as to evidence an intention on the union's part to fragment the bargaining unit. See, e.g., Connell Typesetting Co., 212 NLRB at 921; Comment, 44 Fordham L.Rev. 1256, 1265 (1976).
 
 
 [18]
 Those employers who sign interim agreements and resume operations are in an analogous position to those who refuse to join a lockout and thereby remain in operation. And significantly, just as the latter group could prevent any whipsaw by engaging in the lockout, the former group could do so by refusing to negotiate such agreements
 
 
 [19]
 See Murphy, Impasse and the Duty to Bargain in Good Faith, 39 U.Pitt.L.Rev. 1, 57 (1977); Comment, 44 Fordham L.Rev. 1256, 1264, 1266 (1976)
 
 
 [20]
 One member had withdrawn earlier, but with the consent of both the group and the union. 522 F.2d at 478
 
 
 [21]
 We express neither approval nor disapproval of the result reached in Sangamo Constr. Co., 188 NLRB 159 (1971), as the matter is not now before us
 
 
 [22]
 Instead, the exercise of that right logically should be contingent upon the actual creation of such agreements. The Beck court's concern that, if the union's right "accrues first" it will gain "a tremendous bargaining power and leverage" over the employer group, seems misplaced. As noted above, interim agreements do not significantly impair the integrity of the bargaining unit. Moreover, unlike such weapons as a selective strike which can be deployed unilaterally, the union needs at least one consenting party to implement these agreements. Therefore, the union's ability to threaten to negotiate interim agreements should augment its bargaining power only minimally, if at all, especially if employers are able to withdraw upon any agreement actually being reached. And the Board could justifiably reject any measure that attempts to counteract such incremental leverage by sacrificing the stability of the multiemployer unit
 
 
 [23]
 See Note, 45 Brooklyn L.Rev. 1283, 1318 (1979); Comment, 17 B.C. Indus. & Com.L.Rev. 525, 539-40 & n.133 (1976)
 
 
 [24]
 One widely accepted definition of impasse is "a state of facts in which the parties, despite the best of faith, are simply deadlocked." NLRB v. Tex-Tan, Inc., 318 F.2d 472, 482 (5th Cir. 1963). The Board has fleshed out the term somewhat, indicating that whether an impasse has occurred depends on such factors as "(t)he bargaining history, the good faith of the parties in negotiations, the length of the negotiations, the importance of the issue or issues as to which there is disagreement, (and) the contemporaneous understanding of the parties as to the state of negotiations. Taft Broadcasting Co., 163 NLRB 475, 478 (1967), enforced, 395 F.2d 622 (D.C. Cir. 1968). Nonetheless, the decisional process remains at best an exercise of "judgment," id., and at worst "a visceral reaction of the trial examiner and the Board to the record." Stewart & Engeman, Impasse, Collective Bargaining and Action, 39 U.Cin.L.Rev. 233, 241 (1970)
 
 
 [25]
 A reviewing court's principal task is to ensure that the administrative decision is not "inconsistent with a statutory mandate (and does not) frustrate the congressional policy underlying a statute." NLRB v. Brown, 380 U.S. at 291, 85 S.Ct. at 988